42 A.3d 738 (2012)
163 N.H. 365
Jeffrey FROST and another.
v.
COMMISSIONER, NEW HAMPSHIRE BANKING DEPARTMENT and another.
No. 2011-121.
Supreme Court of New Hampshire.
Argued: November 10, 2011.
Opinion Issued: March 16, 2012.
*740 Devine, Millimet & Branch, P.A., of Manchester (Alexander J. Walker and Joshua M. Wyatt on the brief, and Mr. Walker orally), for the petitioners.
Michael A. Delaney, attorney general (Danielle L. Pacik, assistant attorney general, on the brief, and Lisa M. English, assistant attorney general, orally), for the respondents.
CONBOY, J.
The respondents, the Commissioner of the New Hampshire Banking Department and the New Hampshire Banking Department (collectively, the Department), appeal an order of the Superior Court (McNamara, J.) permanently enjoining the Department from pursuing an administrative proceeding against Jeffrey Frost on the ground that the Department lacked subject matter jurisdiction. The petitioners, Frost, Chretien/Tillinghast, LLC, and Frost Family, LLC, cross-appeal, arguing that the trial court erred by denying their request for attorney's fees. We affirm.
The statutory backdrop to this case is as follows. RSA chapter 397-A (2006) (amended 2009, 2011) governs the licensing of nondepository first mortgage bankers and brokers. In response to the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the SAFE Act), 12 U.S.C. § 5101, which enhanced consumer protection by requiring states to pass legislation establishing minimum standards for licensing and registration of state-licensed mortgage loan originators, the New Hampshire legislature amended RSA chapter 397-A (Supp.2009). Accordingly, effective April 1, 2009, it became unlawful for any individual to transact business in New Hampshire as a mortgage loan originator unless such individual obtains a license from the Department. See RSA 397-A:3, I. In addition, effective July 31, 2009, the statute authorizes license suspension and revocation, as well as penalties for violation of the provisions of the chapter.
The following facts are drawn from the record. Frost is a member and designated manager of Chretien/Tillinghast, LLC (Chretien), and a member of Frost Family, LLC (Frost Family). Chretien and Frost *741 Family (collectively, the LLCs) are New Hampshire limited liability companies organized for the purpose of real estate acquisition, holding, and development. The underlying dispute arose as the result of two seller-financed real estate transactions, one conducted by Frost Family and the other by Chretien.
In September 2008, Frost Family sold a condominium to Cheryl Cayer for $137,000. In lieu of third-party financing, Cayer requested $32,000 in seller financing from Frost Family. At closing, Cayer executed a promissory note to Frost Family, secured by a mortgage, for the financed amount. Cayer paid the remaining purchase price in cash. This transaction is the only mortgage loan that Frost Family has ever made.
The second transaction involved a property owned by Chretien. In September 2008, Robert Recio expressed interest in leasing one of Chretien's properties with an option to purchase. The parties agreed on a purchase price of $475,000. After further discussions, Recio and William Secor signed a long-term lease with Chretien. At the time of the lease execution, the parties also executed an option to purchase the property, which, if exercised, obligated Chretien to provide a first mortgage loan for $425,000 at 6.25% interest, which was "fully due and payable on the third anniversary date of the real estate closing and the transfer of title."
In December 2008, Recio and Secor decided to exercise the option to purchase the property. Recio rejected Chretien's suggestions to look for long-term financing, and instead opted to refinance after closing. In addition, Recio represented to Chretien that he was expecting a large insurance settlement, which would help pay down or satisfy the mortgage.
On March 13, 2009, Recio and Secor executed a promissory note secured by a mortgage to Chretien. Under the terms of the note, Recio and Secor promised to pay $425,000 at 6.25% interest, in monthly payments of $300, plus interest, until March 2012, when the remaining balance was fully due and payable. This transaction is the only mortgage loan Chretien has ever made.
In late 2009, Frost, as manager of Chretien, initiated foreclosure proceedings on the property Chretien sold to Recio and Secor. In response, Recio filed for bankruptcy. In the bankruptcy court, Chretien sought and was granted relief from the automatic stay based on fraudulent misrepresentations by Recio that he had not previously filed for bankruptcy protection. Shortly thereafter, Recio filed a complaint with the Consumer Protection Bureau of the Attorney General's Office alleging, among other things, that Frost and Chretien fraudulently induced him to enter into the sale for an inflated price. Subsequently, Frost was charged with four class A misdemeanors alleging criminal violations of RSA chapter 397-A (prohibiting, among other things, unlicensed mortgage banking). The complaint was also forwarded to the Department. Upon receipt of Recio's complaint, the Department initiated an investigation, which disclosed the two seller-financed transactions by the LLCs.
In March 2009, after both instances of seller-financing, Frost submitted a loan originator license application to the Department. On April 1, 2009, Frost became a licensed mortgage loan originator, see RSA 397-A:1, XVII (Supp.2009) (amended 2011) (defining "Originator"), sponsored by Academy Mortgage, a licensed mortgage banker, see RSA 397-A:1, XII (2006) (defining "Mortgage banker").
In 2010, the Department initiated administrative proceedings against Frost through an "Order to Show Cause with *742 Immediate Emergency Suspension and Cease and Desist Order," as well as a "Staff Petition." In these initiating documents, the Department alleged that although Frost disclosed on his mortgage loan originator's license application that "he was and still is self-employed through" Frost Family, he failed to disclose that Frost Family was a "financial servicesrelated employment." It alleged that "[i]n fact Frost Family served as either the mortgage broker or mortgage banker for [the Cayer] mortgage loan," and that Frost Family was "servicing [the Cayer] mortgage loan without a New Hampshire mortgage servicer registration." See RSA 397-B:4, I (Supp.2009) (describing registration requirements for mortgage servicing companies). The Department alleged further that "Frost failed to include [on his application] ... that he is also part owner of [Chretien]," which conducted a mortgage loan transaction with Recio and Secor, and that Chretien "continues to actively service this ... residential mortgage loan" without a valid mortgage servicer registration or a valid mortgage banker license. See id. Finally, the Department alleged that "Frost, by continuing his employment with both [LLCs] while employed by mortgage banker licensee, Academy Mortgage, as a licensed Mortgage Loan Originator, work[ed] for more than one mortgage banker or mortgage broker and mortgage servicer and [was] therefore in violation of RSA 397-A:1, XVII(a), RSA 397-A:3, III, and/or RSA 397-B:1, IV-c."
At the time the administrative proceedings were initiated, the Department notified Frost that he could request a hearing with the Department under RSA chapter 541-A (2007). Frost did not file such a request. Instead, the petitioners initiated a declaratory judgment proceeding in superior court, which included a request for a temporary restraining order. The petitioners contended that the respondents lacked subject matter jurisdiction to proceed against Frost and violated the State Constitution's prohibition against retrospective laws by seeking to impose a $25,000 fine for each alleged violation.
After a hearing, the trial court granted the preliminary injunction, concluding that "[w]hile the [Department] may have jurisdiction over Frost because he is now a loan originator, it [could] take no action against him based on the September 2008 or the March 2009 transactions." Further, the trial court concluded that since the Department "may not impose any penalties on Frost," it did not need to consider the issue of the retrospective nature of the sanctions.
Subsequently, the parties agreed to treat the preliminary injunction order as a final order. See Super. Ct. R. 161(b)(2). Prior to entry of the final order, however, the trial court allowed the petitioners to file a motion for attorney's fees. The petitioners filed such a motion, which the trial court denied.

I. The Department's Appeal
The Department first argues that the petitioners "should not have been permitted to bypass the statutory administrative procedures by seeking a preliminary and permanent injunction in the superior court." The Department maintains that under the doctrine of primary jurisdiction, the trial court should have abstained from intervening and required the petitioners to exhaust their administrative remedies.
Conversely, the petitioners maintain that the trial court properly exercised its authority to grant both a preliminary and permanent injunction because the Department lacks subject matter jurisdiction under RSA chapter 397-A to regulate the LLCs. Specifically, they argue that because resolution of this issue requires statutory *743 interpretation, and the superior court has authority to issue declaratory findings on issues of law, the trial court did not err.
The doctrine of primary jurisdiction "provides that a court will refrain from exercising its concurrent jurisdiction to decide a question until it has first been decided by the specialized administrative agency that also has jurisdiction to decide it." Wisniewski v. Gemmill, 123 N.H. 701, 706, 465 A.2d 875 (1983).
[The doctrine] is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. It applies to claims that contain some issue within the special competence of an administrative agency. Thus, under the primary jurisdiction doctrine, courts, even though they could decide, will in fact not decide a controversy involving a question within the jurisdiction of an administrative tribunal until after that tribunal has rendered its decision.
2 Am.Jur.2d Administrative Law § 480, at 407 (2004). "Where[, however,] the issue or issues ... involve purely questions of law, the matter will not be referred to an agency." 73 C.J.S. Public Administrative Law and Procedure § 77, at 270 (2004). Because the decision to refrain from exercising its jurisdiction "rests in the sound discretion of the trial judge," Dolan v. Utica Mut. Ins. Co., 630 F.Supp. 305, 308 (D.Mass.1986), we review the court's decision under an unsustainable exercise of discretion standard. See Baykeeper v. NL Industries, Inc., 660 F.3d 686, 690 (3d Cir.2011) ("We review a district court's decision to abstain on primary jurisdiction grounds ... for abuse of discretion."); GCB Communications v. U.S. South Communications, 650 F.3d 1257, 1262 (9th Cir. 2011) ("We review a district court's denial of a request to refer a case to an agency under the primary jurisdiction doctrine for abuse of discretion."); TON Services, Inc. v. Qwest Corp., 493 F.3d 1225, 1239 (10th Cir.2007) ("This court applies an abuse of discretion standard to the district court's decisions to invoke the primary jurisdiction doctrine and to either stay or dismiss the action without prejudice."); see also State v. Lambert, 147 N.H. 295, 296, 787 A.2d 175 (2001).
In Wisniewski, the defendants diverted the flow of a river abutting the plaintiffs' property and theirs without prior authorization by the New Hampshire Water Resources Board. Wisniewski, 123 N.H. at 704, 465 A.2d 875. Upon learning of the defendants' actions, the board ordered them to return the river to its original flow and restore the affected area. Id. Later, however, the board voted to reconsider its order and deferred further action on the issue until the defendants submitted a permit application and detailed plans for the diversion of the river. Id. No plan was ever submitted, but the board took no further action. Id.
The plaintiffs brought an action in superior court for damages caused by the river's diversion. Id. The defendants moved to dismiss the plaintiffs' claim, arguing the trial court lacked jurisdiction over the action because the board had exclusive jurisdiction over matters involving state waters. Id. at 705, 465 A.2d 875. The superior court granted the defendants' motion, and the plaintiffs appealed. Id.
On appeal, we reversed, concluding that the legislature, in enacting RSA chapter 483-A, did not intend "to vest exclusive jurisdiction over state waters in the board and to eliminate the common law right of a property owner to bring an action for a violation of its riparian rights when the board has not authorized the filling or *744 dredging in state waters." Id. Moreover, we rejected the defendants' alternative argument that the trial court's order should have been affirmed under the doctrine of primary jurisdiction. Id. at 706, 465 A.2d 875. We concluded that the doctrine was "inapplicable ... because RSA chapter 483-A granted the water resources board no jurisdiction over disputes between private parties involving an infringement of riparian rights when the filling and dredging was not given prior authorization by the board." Id.
Similarly, if RSA chapter 397-A does not grant the Department jurisdiction over the two transactions at issue here, there is no need for the court to await the outcome of the Department's administrative proceedings centered on these transactions. See 5 G.J. MacDonald, Wiebusch on New Hampshire Civil Practice and Procedure, § 62.04, at 62-4, 62-5 (noting agencies' powers "come solely and directly from the statutes that create them or give them authority and from the necessary implications of those statutes"). Because a determination of the Department's jurisdiction requires statutory analysis, the trial court could properly resolve this legal issue. See 73 C.J.S., supra § 77, at 270 (noting no referral to agency where agency lacks jurisdiction over the matter). While the dissent apparently acknowledges that the doctrine of primary jurisdiction is discretionary, it nevertheless maintains that in circumstances such as those here, where agency action is pending, the trial court's discretion is limited. We do not agree that such limitation is warranted here. We conclude, therefore, that the trial court's decision not to refrain from exercising its jurisdiction did not constitute an unsustainable exercise of that discretion.
We note that our decision here does not alter our law regarding exhaustion of administrative remedies. Whenever a statute provides a procedure for appeal or review of an administrative agency's decision, that procedure is exclusive and must be followed. See Nashua v. Public Utilities Commission, 101 N.H. 503, 506-07, 148 A.2d 277 (1959); 2 Am. Jur.2d. Administrative Law § 475, at 403 (2004) ("[W]here a statute requires exhaustion of administrative remedies a court has no jurisdiction to review an interlocutory order and the exhaustion requirement is not a matter for the court's discretion."). Thus, before an agency decision may be reviewed, administrative remedies typically must be exhausted. See Konefal v. Hollis/Brookline Coop. School Dist., 143 N.H. 256, 258, 723 A.2d 30 (1998) (requiring plaintiff to exhaust her administrative remedies before the PELRB where her claims required resolution of disputed fact, and were therefore exclusively within administrative discretion).
For example, RSA 397-A:7 provides that an applicant who is denied a mortgage lending license by the banking commissioner may appeal the decision in accordance with RSA chapter 541. See RSA 541:22 (2007) ("No proceeding other than the appeal herein provided for shall be maintained in any court of this state to set aside, enjoin the enforcement of, or otherwise review or impeach any order of the [agency], except as otherwise specifically provided."). Thus, under this section, a petitioner must exhaust administrative remedies before seeking judicial review. 5 G.J. MacDonald, supra § 62.28, at 62-28 ("When review under RSA chapter 541 is authorized, it is the exclusive means of challenging an agency's decision.").
By contrast, RSA 397-A:17 (mortgage license revocation and suspension) does not set forth a similar review procedure. Rather, this section simply outlines the procedural steps in the revocation or *745 suspension process. Accordingly, there is no exclusive review process that Frost was required to exhaust.
Assuming, however, that RSA 397-A:17 implies exclusive administrative review remedies, here, exhaustion is not required. "We have recognized that the exhaustion of administrative remedies doctrine is flexible, and that exhaustion is not required under certain circumstances." Konefal, 143 N.H. at 258, 723 A.2d 30; see Metzger v. Brentwood, 115 N.H. 287, 290, 343 A.2d 24 (1975). For example, in Pheasant Lane Realty Trust v. City of Nashua, 143 N.H. 140, 720 A.2d 73 (1998), we explained that "[a] party is not required to exhaust administrative remedies where the issue on appeal is a question of law rather than a question of the exercise of administrative discretion." Pheasant Lane Realty Trust, 143 N.H. at 141-42, 720 A.2d 73 (quotation omitted); see also Bedford Residents Group v. Town of Bedford, 130 N.H. 632, 639, 547 A.2d 225 (1988) (where the issue is a question of law, such as the interpretation of a statute, exhaustion is not necessarily required). Thus, here, where an issue of law is dispositive, the trial court sustainably exercised its discretion to maintain jurisdiction.
Next, the Department contends that the trial court erred in enjoining its administrative proceedings against Frost. Specifically, the Department challenges the trial court's interpretation of RSA chapter 397-A. In reaching its decision to exercise its equitable powers to grant temporary relief, the trial court concluded that the petitioners demonstrated a likelihood of success on the merits. The trial court reasoned that since none of the petitioners could "be said to be in the business of making or brokering mortgage loans, by virtue of a single isolated transaction," RSA chapter 397-A was inapplicable. In addition, the trial court found that without an injunction, the petitioners had no adequate remedy at law and would suffer irreparable harm. We will uphold the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact. N.H. Dep't of Envtl. Servs. v. Mottolo, 155 N.H. 57, 63, 917 A.2d 1277 (2007).
The Department argues that the trial court misinterpreted RSA chapter 397-A. The Department maintains that the chapter applies to all residential mortgage transactions that are not specifically exempt under RSA 397-A:4 (exempting certain classes of persons from licensing requirements). It argues that mortgage loans executed by the LLCs were not exempt "because those companies were not... `natural person[s],'" so licensure was required. See RSA 397-A:4, II (exempting "[a]ny natural person making not more than 4 first mortgage loans within any calendar year with the person's own funds and for the person's own investment without an intent to resell such mortgage loans").
We review the trial court's statutory interpretation de novo. Fog Motorsports #3 v. Arctic Cat Sales, 159 N.H. 266, 267, 982 A.2d 963 (2009). We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Kenison v. Dubois, 152 N.H. 448, 451, 879 A.2d 1161 (2005). When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. Fog Motorsports #3, 159 N.H. at 268, 982 A.2d 963. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We also interpret a statute in the context of the overall statutory scheme and not in isolation. Id.
*746 RSA 397-A:2 provides in pertinent part that:
This chapter shall provide for the department's regulation of persons that engage in the business of making or brokering mortgage loans secured by real property located in the state of New Hampshire, which is or shall be occupied in whole or in part as a place of residence by the borrower and which consists of not more than 4 living units.
RSA 397-A:2, I (emphasis added). Thus, by its plain and unambiguous language, the statute grants the Department jurisdiction only over "persons that engage in the business of making or brokering mortgage loans." The qualification that a person be a natural person relates not to this jurisdictional predicate, but rather to the exemption set forth in RSA 397-A:4, II. Because our analysis focuses on the scope of the Department's subject matter jurisdiction under RSA chapter 397-A, we need not consider, as the dissent suggests, the exemptions delineated in RSA 397-A:4. The question, then, is whether either of the LLCs was a person "engage[d] in the business of making or brokering mortgage loans" by virtue of a single isolated transaction, thereby subjecting Frost, as its agent, to the Department's administrative proceedings. We agree with the trial court's conclusion that the LLCs were not engaged in the business of making mortgage loans.
The statute does not define the phrase "engage in the business." Generally, however, "business" is defined as "transactions, dealings, or intercourse of any nature." Webster's Third New International Dictionary 302 (unabridged ed. 2002) (defining "business"); see also Black's Law Dictionary 226 (9th ed. 2009) (defining "business" as "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain" (emphasis added)). Thus, to "engage in the business" implies multiple transactions or dealings, rather than a single incident.
Our case law supports the contention that a single mortgage lending transaction does not constitute being "in the business" of making mortgage loans. In Green Meadows Mobile Homes v. City of Concord, 156 N.H. 394, 397, 934 A.2d 586 (2007), we held that the petitioners were not "dealer[s]" because "while the petitioners on occasion [sold] manufactured housing units, they [were] not in the business of selling such units, but rather [were] in the business of owning and managing manufactured housing parks." Id. (quotations and brackets omitted). Similarly, in Hughes v. DiSalvo, 143 N.H. 576, 578, 729 A.2d 422 (1999), we concluded that the plaintiff, who rented and attempted to sell her real property through a lease and sales agreement, did not violate the Consumer Protection Act because remedies under the Act are not available when the subject transaction is strictly private in nature, and not undertaken in the ordinary course of a trade or business. Thus the plaintiff's involvement in a single transaction was insufficient to constitute engagement in trade or commerce. Id. at 578-79, 729 A.2d 422 ("The plaintiff was not a real estate professional engaged in the business of renting or selling properties."); cf. Currier v. Tuck, 112 N.H. 10, 12, 287 A.2d 625 (1972) ("It has been held that an occasional isolated act of loaning money as an accommodation to a customer or friend is not engaging in the business of making loans under similar statutes.").
Finally, the subsequent legislative history, while not controlling, supports our construction. See Franklin v. Town of Newport, 151 N.H. 508, 512, 861 A.2d 777 (2004). In response to the federal SAFE Act, the New Hampshire legislature initially *747 narrowed the exemptions for seller-financing to exclude from the licensing requirements only "[a]ny individual who offers or negotiates terms of a residential mortgage loan with or on behalf of an immediate family member of the individual," or "[a]n individual who offers or negotiates terms of a residential mortgage loan secured by a dwelling that served as the individual's residence." RSA 397-A:4, III-IV (Supp.2009).
Subsequently, however, section four was again amended. Effective July 1, 2011, RSA 397-A:4 (Supp.2011) was amended to provide as follows:
The provisions of this chapter shall not apply to ... [a]n owner of real property who in any 12 consecutive month period makes no more than 3 mortgage loans to purchasers of the property for all or part of the purchase price of the real estate against which the mortgage is secured....
RSA 397-A:4, VI; Laws 2011, 212:1. The purpose of the amendment was to combat the "excessive enforcement of the SAFE Act," see RSA 397-A (2009), and to "restore common sense to New Hampshire law" after the July 2009 amendments "harshly eliminated any legal commerce in most private residential lending." N.H.H.R. Jour. 1579 (2011). With this amendment, the legislature has made clear that the statute applies only to persons who make numerous loan transactions per year.
We conclude, therefore, that in context, "engag[ing] in the business" of mortgage lending requires more than a single isolated transaction. Because each of the LLCs conducted only one mortgage lending transaction, neither "engage[d] in the business of making or brokering mortgage loans," RSA 397-A:2, I, and, thus, Frost had no obligation to disclose the two transactions on his license application. Moreover, neither of the LLCs was a mortgage banker or mortgage broker, see RSA 397-A:1, XII-XIII, so Frost did not "work[ ] for more than one mortgage banker or mortgage broker and mortgage servicer...." Therefore, although Frost became subject to the Department's regulation when he became a licensed mortgage loan originator, after the two seller-financed transactions by the LLCs occurred, he is not subject to disciplinary action by the Department based upon those transactions.
Given our holding herein, and the fact that penalties were not, in fact, imposed on Frost, we need not address the Department's argument that its application of the suspension and penalty provisions set forth in RSA 397-A:14 and RSA 397-A:17 would not have violated Part I, Article 23 of the New Hampshire Constitution. See N.H. CONST. pt. I, art. 23 ("Retrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses.").
We conclude, therefore, that the trial court sustainably exercised its discretion by enjoining the Department from taking disciplinary action against Frost with respect to the LLCs' single mortgage lending transactions. Our decision, however, does not otherwise limit the Department's regulatory authority over Frost as a mortgage loan originator.

II. The Petitioners' Cross-Appeal
Finally, the petitioners challenge the trial court's denial of attorney's fees. Specifically, they maintain that they are entitled to attorney's fees because: (1) the Department acted in bad faith; (2) the Department "intru[ded] upon the protection against retrospective laws"; and (3) "they conferred a substantial benefit on the public through this action." We disagree.
*748 We will not overturn the trial court's decision concerning attorney's fees absent an unsustainable exercise of discretion. Grenier v. Barclay Square Commercial Condo. Owners' Assoc., 150 N.H. 111, 115, 834 A.2d 238 (2003). To warrant reversal, the discretion must have been exercised for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the objecting party. Arcidi v. Town of Rye, 150 N.H. 694, 704, 846 A.2d 535 (2004). In evaluating the trial court's ruling on this issue, we acknowledge the "tremendous deference" given a trial court's decision regarding attorney's fees. Grenier, 150 N.H. at 116, 834 A.2d 238. If there is some support in the record for the trial court's determination, we will uphold it. Arcidi, 150 N.H. at 704, 846 A.2d 535.
"A prevailing party may be awarded attorney's fees when that recovery is authorized by statute, an agreement between the parties, or an established judicial exception to the general rule that precludes recovery of such fees." Tulley v. Sheldon, 159 N.H. 269, 272, 982 A.2d 954 (2009) (quotation omitted). "As to judicially-created exceptions, attorney's fees have been awarded in this State based upon two separate theories: bad faith litigation and substantial benefit." Bedard v. Town of Alexandria, 159 N.H. 740, 744, 992 A.2d 607 (2010) (quotations and ellipsis omitted). "Under the bad faith litigation theory, an award of attorney's fees is appropriate where one party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, where the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and where it should have been unnecessary for the successful party to have brought the action." Id. (quotations omitted). "Under the substantial benefit theory[,] ... attorney's fees may be awarded when a litigant's actions confer a substantial benefit upon the general public." Id. (quotations omitted).
Here, the trial court found that the petitioners met none of the standards warranting departure from the general rule. After review of the record, we agree and conclude that the trial court sustainably exercised its discretion. First, the record supports the trial court's finding that the Department did not act in bad faith. The Department neither employed obstinate or unreasonable litigation tactics, nor did it seek "burdensome discovery."
Nevertheless, the petitioners contend that the trial court erred when it failed to consider, in its bad faith analysis, the Department's allegedly "obstinate and unlawful" pre-lawsuit conduct. In particular, the petitioners argue that litigation was "unnecessary" and was prompted only by their need to protect themselves against the Department's "unconstitutional investigatory tactics" and the disputed staff petition. We disagree.
Despite the petitioners' representations to the contrary, the trial court did address their argument regarding the Department's investigatory tactics. The court ruled that "the theory that the State's conduct in related criminal proceedings and issuing search warrants and administrative actions would authorize an award of attorney's fees ... [cannot] be sustained." Further, it rejected the petitioners' argument that an award of fees was supported by alleged flaws in the staff petition (i.e., naming Frost individually, creating "illusory" charges by "duplicating" alleged misconduct, and threatening unconstitutional retroactive penalties). The trial court noted that "[the Department] took a legal position which involved complex statutes and their application to a highly regulated industry." Thus, we find no merit in the petitioners' claim that the trial court failed *749 to address the Department's pre-lawsuit conduct.
Moreover, as the trial court noted, the complexity of the underlying suit suggests that the petitioners were not forced to litigate a clearly defined right. We agree that the rights at issue were not clearly defined, as is evidenced by the fact that the petitioners filed an expert report to aid the trial court in understanding the statutes involved in this case.
Finally, the trial court did not err in finding the substantial benefit exception inapplicable. As the trial court noted, the exception is based on promotion of the public benefit, not the petitioners' own benefit. See Bedard, 159 N.H. at 746, 992 A.2d 607.
Affirmed.
DALIANIS, C.J., and HICKS, J., concurred; LYNN, J., with whom DUGGAN, J., retired, specially assigned under RSA 490:3, joined, dissented.
LYNN, J., dissenting.
Because I conclude that, under the doctrine of primary jurisdiction, the superior court erred in enjoining the ongoing enforcement proceedings before the banking department, I would reverse.
Perhaps the best elucidation of the doctrine of primary jurisdiction is that found in a prominent administrative law treatise:
The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court. The doctrine of primary jurisdiction does not necessarily allocate power between courts and agencies, for it governs only the question whether court or agency will initially decide a particular issue, not the question of whether court or agency will finally decide the issue.
3 K. Davis, Administrative Law Treatise § 19.01, at 3 (1958), quoted in Sears, Roebuck & Co. v. Carpenters, 436 U.S. 180, 199 n. 29, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978); see also Pharmaceutical Research and Mfrs. of America v. Walsh, 538 U.S. 644, 673, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (Breyer, J., concurring in part and concurring in the judgment) ("[Primary jurisdiction] seeks to produce better informed and uniform legal rulings by allowing courts to take advantage of an agency's specialized knowledge, expertise, and central position within a regulatory regime."); Konefal v. Hollis/Brookline Coop. School Dist., 143 N.H. 256, 258, 723 A.2d 30 (1998) ("Primary jurisdiction in an agency requires judicial abstention until the final administrative disposition of an issue, at which point the agency action may be subject to judicial review." (quotations omitted)). Because primary jurisdiction is a prudential doctrine, rather than one based on the absence of judicial power,[1] there is no "fixed formula" for determining when the doctrine applies. United States v. *750 Western Pac. R. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). However, the following factors are often cited as relevant considerations in making this determination: (1) the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue in dispute; (2) the need for uniform resolution of the issue; and (3) the potential that judicial resolution of the issue will have an adverse impact on the agency's performance of its regulatory responsibilities. See II K. Davis & R. Pierce, Jr., Administrative Law Treatise § 14, at 272 (3d ed. 1994); see also Walsh, 538 U.S. at 673, 123 S.Ct. 1855 (Breyer, J., concurring in part and concurring in the judgment) ("[The question], in a word, [is] whether preliminary reference of issues to the agency will promote that proper working relationship between court and agency that the primary jurisdiction doctrine seeks to facilitate."); cf. Konefal, 143 N.H. at 258, 723 A.2d 30 ("The rule requiring administrative remedies to be exhausted prior to appealing to the courts is based on the reasonable policies of encouraging the exercise of administrative expertise, preserving agency autonomy and promoting judicial efficiency." (quotations omitted)).
While acknowledging the doctrine of primary jurisdiction, the majority holds that the trial court did not unsustainably exercise its discretion in declining to apply the doctrine because the issue addressed by the trial court concerned the banking department's subject matter jurisdiction and was purely a question of law rather than of administrative discretion. I believe the majority takes too narrow a view of the circumstances under which deference is owed to an administrative agency, and that the cases it relies on to support its position are distinguishable in important respects from this case. Accordingly, I would find that the trial court's decision to enjoin the ongoing banking department proceedings did constitute an unsustainable exercise of discretion.
None of the cases relied on by the majority involved an effort to enjoin an ongoing administrative enforcement proceeding, i.e., a proceeding examining whether a licensee had violated a regulatory regime, a circumstance that presents a particularly compelling reason for a court to stay its hand. See Interfaith Community Organization v. PPG, 702 F.Supp.2d 295, 310 (D.N.J.2010); accord Dept. of Public Works v. L.G. Indus., 758 A.2d 950, 957 (D.C.2000) (reversing grant of injunction against agency enforcement proceeding, and admonishing that "the trial court must be especially careful before resorting to that remedy where ... the requested relief would enjoin agency action pending the outcome of administrative review. In part the reason for this restraint is the very one that underlies the primary jurisdiction doctrine, which is that the court is actingand risks disruptionin a field that is normally confided to the agency's expertise" (quotations, brackets, and citation omitted)); Bar Harbor Banking & Trust Co. v. Alexander, 411 A.2d 74, 78 (Me.1980) (lifting temporary restraining order that prevented Bureau of Consumer Protection from holding hearing to determine whether bank had violated statute regulating permissible finance charges, explaining that "[w]here the administration of a particular statutory scheme has been entrusted to an agency, the Court will postpone consideration of an action until the agency has made a designated determination if such postponement will protect the integrity of the statutory scheme" (quotation omitted)); Luskin's Inc. v. Consumer Protection, 338 Md. 188, 657 A.2d 788, 793 (1995) (holding that primary jurisdiction doctrine required dismissal of declaratory judgment action filed by merchant subject to agency proceedings for *751 misleading consumer advertising); Zar v. S.D. Bd. of Examiners of Psychologists, 376 N.W.2d 54, 55 (S.D.1985) (reversing writ of prohibition preventing disciplinary proceedings against licensee; trial court had reasoned that it should make initial decision as to whether Board lacked jurisdiction to discipline licensee because of alleged invalidity of administrative rules; supreme court disagreed, citing Myers v. Bethlehem Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), for proposition that "[u]nder the doctrine of separation of powers, an administrative agency, a branch of the executive department, is empowered to determine its own jurisdiction" in the first instance); cf. Smith v. N.H. Bd. of Psychologists, 138 N.H. 548, 554, 645 A.2d 651 (1994) (reversing trial court's entry of injunction that prevented Board of Examiners of Psychologists from conducting disciplinary proceedings involving licensees).
Unlike the instant case, Wisniewski v. Gemmill, 123 N.H. 701, 465 A.2d 875 (1983), on which the majority primarily relies, did not involve an action in which the plaintiff sought an injunction against the regulatory agency itself; indeed, the agency (the former water resources board) was not even a party to that case. Instead, the lawsuit was a common law action for damages between private parties in which the defendant sought dismissal based on the argument that, because the suit concerned the alteration of the course of a public water body, the board had exclusive jurisdiction. Id. at 705, 465 A.2d 875. Moreover, unlike this case, where the banking department was actively pursuing administrative proceedings against petitioner Frost and had extended him the opportunity for a hearing at the time he sought judicial relief, in Wisniewski, the agency proceedings had lain dormant for nine months before suit was filed. See id. at 704, 465 A.2d 875; cf. Coit Independence Joint Venture v. FSLIC, 489 U.S. 561, 586-87, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989) (expressing concern that requiring exhaustion of administrative remedies would relegate parties to a dispute resolution process the Court described as a "black hole"). Furthermore, none of the parties before the court in Wisniewski was a licensee of the water resources board, nor did the board have the authority to award the type of relief, i.e., monetary damages, that the plaintiff was seeking. See Wisniewski, 123 N.H. at 707, 465 A.2d 875. Here, by contrast, Frost was a licensee of the banking department, and, as the majority recognizes, the department therefore unquestionably had "regulatory authority" over him. Thus, even accepting the majority's construction of "engage in the business" as used in RSA 397-A:2 (2006 & Supp.2011), the department, at worst, had a mistaken view of the scope of its regulatory authority. But no one disputes that this was an issue Frost could have challenged, and the department could have decided, at an administrative hearing, which would have to have been conducted pursuant to the provisions of the Administrative Procedures Act governing adjudicative proceedings. See RSA 397-A:17, III (2006); RSA 541-A:30, III (2007). Collectively, the foregoing considerations demonstrate that this case presents a far more compelling argument for invoking primary jurisdiction than did Wisniewski.
The other cases cited by the majority, Pheasant Lane Realty Trust v. City of Nashua, 143 N.H. 140, 720 A.2d 73 (1998), Bedford Residents Group v. Town of Bedford, 130 N.H. 632, 547 A.2d 225 (1988), and Metzger v. Brentwood, 115 N.H. 287, 343 A.2d 24 (1975), also are distinguishable. Not only did none of those cases involve agency enforcement proceedings, but the land use and/or property tax statutes at issue in those cases were also not nearly as complexor the legal position of *752 the governmental body as arguableas that presented here. It is a well-recognized principle of administrative law that where the legislature has described an agency's powers in broad and ambiguous language, the agency generally is given the first opportunity to rule upon the extent of its jurisdiction. Although we have not gone so far as to adopt the federal rule, which requires courts to defer to an agency's reasonable construction of an agencyadministered statute, see Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-45, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we have long taken the view that substantial deference is due to the interpretation placed on a statute of doubtful meaning by the agency charged with its implementation. See Grand China v. United Nat'l Ins. Co., 156 N.H. 429, 434, 938 A.2d 905 (2007); cf. Win-Tasch Corp. v. Town of Merrimack, 120 N.H. 6, 9-10, 411 A.2d 144 (1980). The doctrine of primary jurisdiction complements our substantial deference policy by ensuring that an agency is given the first opportunity to construe an ambiguous statute. See Verizon New England v. Maine Public Utilities, 509 F.3d 1, 11-12 (1st Cir.2007). As Professor Pierce explains:
The primary jurisdiction doctrine often compels a court to refer an issue to an agency ... when the issue ultimately is determined not to be within the agency's statutory jurisdiction. The resulting situationan agency's primary jurisdiction is often broader than its statutory jurisdictionseems strange at first glance. It makes eminently good sense, however, upon examination of the nature and frequent difficulty of determining the scope of the agency's statutory jurisdiction.
II R. Pierce, Jr., Administrative Law Treatise § 14.2, at 1185 (5th ed. 2010). Put another way, the primary jurisdiction doctrine comes into play when conduct that is the subject of court litigation "is... at least arguably protected or prohibited by a ... regulatory statute" and when agency resolution of an issue is likely to be of "material aid" to judicial resolution of the dispute. Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 299-300, 302, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); see Clark v. Time Warner Cable, 523 F.3d 1110, 1115-16 (9th Cir.2008) (referring matter to agency where issue was novel, agency regarded resolution of issue as important to policies it was required to implement, and agency had issue under active consideration); cf. Leedom v. Kyne, 358 U.S. 184, 188-89, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) (declining to require exhaustion of administrative remedies when agency action is plainly ultra vires).
At the times pertinent to this case, RSA chapter 397-A established a comprehensive regulatory scheme for "persons that engage in the business of making or brokering" certain mortgage loans. RSA 397-A:2, I (2006). If the "engage in the business" language found in RSA 397-A:2, I, were the only pertinent section regarding the scope of the statute, I would agree with the majority that the statute does not reach the two isolated mortgage loan transactions conducted by Frost Family and Chretien. However, this is not the case. Instead, RSA 397-A:3, I (2006 & Supp.2011) provides: "Any person not exempt under RSA 397-A:4 that, in its own name or on behalf of other persons, engages in the business of making or brokering mortgage loans secured by real property located in this state shall be required to obtain a license from the department." (Emphasis added.) And, when these transactions occurred, RSA 397-A:4 (2006) provided, in relevant part, that RSA chapter 397-A was inapplicable to:
II. Any natural person making not more than 4 first mortgage loans within *753 any calendar year with the person's own funds and for the person's own investment without an intent to resell such mortgage loans.
III. Any natural person who, as seller, receives one or more first or second mortgages or deeds of trust on real estate as security for a purchase money obligation.
(Emphases added.)
Because neither Frost Family nor Chretien is a "natural person," neither was covered by these exemptions.[2] More importantly, the existence of these statutory exemptions results in an ambiguity as to the intended meaning of the "engage in the business" term found in RSA 397-A:2, I, and :3. The effect of the first exemption is to create a safe harbor for natural persons who make fewer than five first mortgage loans within a calendar year. The effect of the second is to exclude any natural person who provides a first or second mortgage as part of seller-financing in connection with even one property he or she sells to another. Contrary to the majority's suggestion, it is not proper to simply ignore these exemptions in construing the scope of the banking department's authority under RSA chapter 397-A. Indeed, failing to consider the exemptions in determining what is meant by the term "engage in the business" of making or brokering loans is inconsistent with a first principle of statutory interpretationthat statutory provisions are not to be considered in isolation but in the context of the entire statutory scheme. State v. Jennings, 159 N.H. 1, 3, 973 A.2d 340 (2009). By failing to consider the overall statutory scheme, the majority offers no answer to what is the seminal question that must be addressed in order to properly construe the statute: If the legislature intended "engage in the business" to cover only nonnatural persons who regularly or habitually make or broker mortgage loans, why would it have found it necessary to specifically exclude them in the above exemptions?[3]See State v. Pierce, 152 N.H. 790, 791, 887 A.2d 132 (2005) ("All words of a statute are to be given effect, and the legislature is presumed not to use words that are superfluous or redundant."). Reading the statute as a whole, one plausible construction is that the legislature intended non-natural persons, such as Frost Family and Chretien, to be deemed "engaged in the business" of making or brokering mortgages even if they engage in only a single transaction. And, of course, if the statute is construed so as to require Frost Family and Chretien to have been licensed, then there is a basis for the banking department's investigation into whether Frost (1) made misrepresentations in his application for licensure as a loan originator, *754 (2) serviced loans for non-licensed mortgage bankers, and (3) simultaneously represented more than one mortgage banker. See RSA 397-A:1, XVII, :3, III, :17 (2006 & Supp.2011).[4]
To be clear, it is not my purpose to attempt a definitive construction of RSA chapter 397-A. Given the statute's ambiguity, it may be that ultimately I too would come to the conclusion that the most sensible construction of RSA 397-A:2 and :3 would exclude Frost Family and Chretien from being "engaged in the business" of making or brokering mortgage loans.[5] To me, the critical point is that any such construction of the statute by either the trial court or this court is premature at this time. Rather, in my view, where, as here, the banking department had not obviously overstepped the bounds of its authority, respect for the proper functioning of an agency of a coordinate branch of government that has been given primary jurisdiction to regulate in the field required the trial court to refrain from interfering with the ongoing administrative proceedings.
In closing, I also must note my concern that today's decision may pave the way for future licensees to attempt to circumvent agency enforcement proceedings any time imaginative counsel is able to fashion a plausible argument that the agency has misinterpreted its regulatory authority. Needless to say, such a development would not be consonant with sound public policy.
*755 For the reasons stated above, I respectfully dissent.
DUGGAN, J., retired, specially assigned under RSA 490:3, joins in the dissent.
NOTES
[1] Although not grounded in an absence of judicial power, the primary jurisdiction doctrine does implicate separation of powers concerns because it relates to the relationship between the branches of government. See, e.g., Travelers Ins. Co. v. Detroit Edison Co., 465 Mich. 185, 631 N.W.2d 733, 741 (2001) (noting that one of the justifications for the primary jurisdiction doctrine "relates to respect for the separation of powers and the statutory purpose underlying the creation of the administrative agency, the powers granted to it by the legislature, and the powers withheld[;t]his justification includes the principle that courts are not to make adverse decisions that threaten the regulatory authority and integrity of the agency").
[2] Nor do petitioners argue that any other provisions of RSA 397-A:4 in effect at the relevant times exempt Frost Family or Chretien from the reach of RSA chapter 397-A.
[3] Insofar as the RSA 397-A:4, II exemption is designed to establish a safe harbor for a course of conduct that might otherwise constitute "engaging in the business," it might be contended that the exclusion of non-natural persons from this exemption was merely intended to disqualify entities (non-natural persons) from the safe harbor, not to signify that entities did not have to make or broker mortgages with some level of regularity in order to be engaged in the business. The same argument cannot be made as to the RSA 397-A:4, III exemption. The fact that, with respect to natural persons, the legislature found it necessary to include a specific exemption for a person who makes even one seller-financing mortgage suggests that without the exemption such person could be considered engaged in the business of making mortgages; and, of course, the exemption does not apply to non-natural persons even if they make only one seller-financing mortgage.
[4] Both the petitioners and the trial court seemed to recognize that the meaning of the statute was less than completely clear. This is demonstrated by the fact that the petitioners found it necessary to provide the trial court with an expert report from a banking law attorney opining on his interpretation of the scope of activity falling within the reach of the statute. The trial court considered this report and found it "valuable and helpful." It also is demonstrated by the trial court's denial of the petitioners' request for attorney's fees. Rejecting the petitioners' claim that the defendants acted in bad faith, the court found, "[the banking department] took a legal position which involved complex statutes and their application to a highly regulated industry."
[5] I cannot agree with the majority that the legislative history of the 2011 amendment to RSA 397-A:4 supports its construction of the 2005 version of the statutethe version that is controlling with respect to the conduct at issue. On this point, I note initially that the very fact that the majority deems it necessary to reference legislative history confirms my view that, prior to the 2011 amendment, the statute was ambiguous with respect to whether Frost Family and Chretien were engaged in the business of making or brokering mortgages. See Appeal of Cote, 144 N.H. 126, 129, 737 A.2d 1114 (1999) ("While legislative history may be helpful in the interpretation of an ambiguous statute, it will not be consulted when the statutory language is plain." (quotation omitted)). More importantly, while the actions of Frost Family and Chretien would appear to have been exempt if they had occurred after the 2011 amendment to RSA 397-A:4 had taken effect, that amendment clearly did more than clarify pre-existing law. On the contrary, as its legislative history makes clear, the amendment was intended to change existing law to expand the circumstances in which seller-financing of real estate transactions would be allowed without the need for the seller to be licensed. See Hearing on SB 28 before Senate Commerce Comm. (Jan. 25, 2011) (testimony of Sen. Boutin) ("This de minimis exemption would allow a number of the transactions which cannot be completed now while ensuring that the exemption will not undermine the current law." (emphasis added)); N.H.H.R. Jour. ___ (May 25, 2011) (remarks of Rep. Manuse) ("Current law requires any person to get a mortgage loan originators license from the New Hampshire banking department, even in harmless circumstances when licensing private citizens who intend to make up to three loans is not practical." (emphasis added)). The 2011 amendment is the first time the legislature clearly created a safe harbor exemption that covers non-natural persons such as Frost Family and Chretien.