NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Rockingham
No. 2015-0692

FAT BULLIES FARM, LLC

v.

LORI DEVENPORT & a.

Argued: November 9, 2016
Opinion Issued: May 26, 2017

Douglas, Leonard & Garvey, P.C., of Concord (Charles G. Douglas, III on the brief and orally), for the plaintiff and counterclaim defendants.

Hinckley, Allen & Snyder, LLP, of Concord (Christopher H.M. Carter and Daniel M. Deschenes on the brief, and Mr. Carter orally), for the defendants.

HICKS, J. The plaintiff, Fat Bullies Farm, LLC (Fat Bullies), and the counterclaim defendants, Donald Gould and Peter Simmons, appeal various findings and rulings of the Superior Court (Wageling, J.) made during the course of litigation with the defendants, Alan and Donna Perkins and Lori and Bret Devenport, involving the sale of a 3.1 acre horse farm in North Hampton known as Runnymede Farm. We affirm in part, reverse in part, and remand.

I.  Factual Background

The following facts, taken from the trial court's various orders in this case, are relevant to our analysis.  The Devenports bought Runnymede Farm in 1998.  The property housed a barn, an apartment, and stables, and included a grazing easement over adjoining lots.  When the Devenports purchased the property, they promised to operate it as a horse farm in perpetuity, and to allow the former owner — not a party to this case — to maintain an office on site.

On July 15, 2010, the Devenports ran into Simmons — a real estate investor — at a local restaurant.  Because they had been contemplating selling Runnymede, the Devenports asked Simmons if he knew someone who might be interested in purchasing the property.  Simmons later told them that he was interested, and inquired into its purchase price.  Bret Devenport responded that they were asking $800,000, and that they would only sell Runnymede if the buyer agreed to continue operating the property as a horse farm and to allow the former owner to maintain an office on site.

Simmons thereafter spoke with Gould — a retired Massachusetts attorney — about purchasing the property jointly with the intent to develop and/or resell it.  Gould agreed, and the two created Fat Bullies "for the purpose of acquiring real estate for development or resale."  Simmons and Gould then contacted an attorney, who drafted an "option agreement" to be executed by the Devenports and Fat Bullies.  The draft option agreement stated a purchase price of $700,000.

According to the testimony generally credited by the trial court, the following day, July 16, Simmons and Gould went to Runnymede to meet with the Devenports.  Simmons introduced Gould as his attorney, and explained that they were there to talk about purchasing the farm.  Simmons asked to see the trophies won by the farm's horses and the stall of a famous horse previously boarded there.  Simmons, Gould, and the Devenports also discussed various topics, including the cost of running Runnymede, who would manage the farm, and the horses that were currently being boarded there.

Simmons provided the Devenports with a copy of the draft option agreement.  The Devenports reviewed the draft agreement, which they believed to be akin to a right of first refusal.  The contract was amended to reflect a purchase price of $800,000.  The Devenports reiterated that they would sell the property only if Fat Bullies committed to operating it as a horse farm.  Despite their intentions to develop the property, Simmons and Gould agreed.  The Devenports and Fat Bullies then executed the agreement, which provided:

2

OPTION TO PURCHASE

The Parties, Bret Devenport and Lori Devenport ("Sellers") . . . and Fat Bullies Farm ("Buyer"), do hereby agree as follows:

1. That Buyer shall have an Option to Purchase ("Option") the approximately 3-acre farm, commonly known as Runnymede Farm, located at 62 Atlantic Avenue ("Property") for $800,000.
2. That such Option shall be for a 90-day period from the date of the signing of this Option. Such 90-day period ends on October 14, 2010.
3. That such Option shall be in consideration for $1,000.00 cash, the receipt of which is hereby acknowledged by Sellers.
4. During the 90-day Option period, the parties shall consult with each other in order to determine the method of payment that is most mutually beneficial for tax purposes.

Pursuant to this agreement, Fat Bullies paid the Devenports $1,000.

The next day, Simmons and Gould returned to Runnymede to take photographs of the property. While there, Simmons told Lori Devenport that he could see his grandchildren growing up on the farm.

Later that month, Bret Devenport called Simmons to speak about the manner of payment. Simmons told Bret Devenport that he was busy and would return the call later, but it appears that he did not do so. On several occasions Bret Devenport tried to speak with Simmons about payment, to no avail.

Also in July 2010, Simmons began speaking to others in North Hampton, asking whether they were interested in purchasing Runnymede. After hearing this, Lori Devenport sent a letter on October 11, 2010, to Simmons informing him that the Devenports no longer wanted to sell the farm. She sent this letter because she believed that Simmons had lied to them when he promised to operate Runnymede as a horse farm. However, the letter stated that the Devenports had decided not to sell Runnymede because their children were still in school.

On October 12, 2010, Simmons visited Runnymede and asked the Devenports if they were ready to close the sale on the property. Bret Devenport replied that they were not going to sell Simmons the farm. As stated by the trial court, Simmons responded that he would sue the Devenports and would "own Runnymede within 24 hours." Fat Bullies also sent a letter to the Devenports purporting to invoke the option to purchase the farm. Despite Fat Bullies' efforts, the Devenports refused to sell it the property. Instead, in April 2011, the Devenports sold Runnymede to the Perkinses.

3

Simmons thereafter confronted Bret Devenport at a gas station, and stated something to the following effect:

> You've got to make this better.  You have until Wednesday morning or the hammer is going to come down.  I know where you live . . . . You can run but you cannot hide.  I will take you to court and it will cost you thousands of dollars and not cost me anything.

(Quotation omitted.)  The Devenports refused to attempt to invalidate the sale of the property to the Perkinses and this litigation followed.

II.  Procedural History

This litigation consists of four separately filed actions, which the trial court consolidated.  Fat Bullies first filed suit against the Devenports, alleging, among other things, breach of the option agreement.  It thereafter filed two actions against the Perkinses alleging tortious interference with contractual relations — one seeking monetary relief, and the other seeking equitable relief. Finally, the defendants brought an action against Fat Bullies, Simmons, and Gould in which the Devenports asserted a fraudulent inducement claim, and the Devenports and Perkinses collectively asserted a claim under the Consumer Protection Act (CPA), see RSA ch. 358-A (2009 & Supp. 2016), among other things.

The parties' claims were resolved at various stages of litigation.  The trial court dismissed Fat Bullies' claim seeking equitable relief against the Perkinses for purported tortious interference with the option agreement, and granted summary judgment to the Perkinses on Fat Bullies' remaining tortious interference claim.  The Perkinses voluntarily non-suited their CPA claim.  After trial, the jury returned a verdict in favor of the Devenports on Fat Bullies' breach of contract claim, finding that Fat Bullies failed to prove the existence of a contract by a preponderance of the evidence, and a verdict in favor of Fat Bullies, Simmons, and Gould on the Devenports' fraudulent inducement claim. Additionally, the jury returned an advisory verdict against Fat Bullies and Simmons, but in favor of Gould, on the Devenports' CPA claim.  The trial court then denied Fat Bullies and Simmons's motion to set aside the advisory verdict on the Devenports' CPA claim, effectively adopting the jury's advisory verdict.

The trial court also made various non-dispositive rulings against Fat Bullies during the course of litigation.  The adverse rulings relevant to this appeal include a ruling granting the defendants' motion to quash a deposition subpoena duces tecum and a ruling limiting the cross-examination of one of the Devenports' witnesses at trial.  The trial court also: (1) awarded attorney's fees and costs to the Perkinses, finding that Fat Bullies' claims against them were brought in bad faith; (2) awarded double attorney's fees and double costs to the Devenports as damages under the CPA; (3) determined that the

4

Devenports reasonably incurred $323,593 in fees and $18,233.41 in costs, and that the Perkinses reasonably incurred $199,181.84 in fees and $955.60 in costs; and (4) determined that both Simmons and Gould were personally liable for the payment of the Perkinses' attorney's fees and costs. This appeal followed.

III. Analysis

Fat Bullies, Simmons, and Gould now appeal: (1) the trial court's adoption of the advisory jury verdict on the Devenports' CPA claim; (2) the trial court's award of double attorney's fees and costs to the Devenports as damages under the CPA; (3) the trial court's grant of summary judgment to the Perkinses on Fat Bullies' claim seeking monetary relief for the Perkinses' purported tortious interference with the option agreement; (4) the trial court's award of attorney's fees and costs to the Perkinses; (5) the trial court's determination as to the reasonableness of the requested fees; (6) the trial court's ruling that Gould and Simmons were personally liable for payment; and (7) the trial court's rulings quashing Fat Bullies' deposition subpoena duces tecum and limiting the cross-examination of one of the Devenports' witnesses at trial. We address these issues in turn.

A. CPA Claim

Fat Bullies and Simmons argue that the trial court erred in finding that they violated the CPA. See RSA ch. 358-A. They assert, among other things, that their conduct did not rise to the level of a CPA violation — in other words, that it did not constitute an "unfair or deceptive act or practice" as contemplated by the act. RSA 358-A:2 (Supp. 2016). In opposition, the Devenports contend that the trial court properly ruled that Fat Bullies and Simmons violated the CPA by engaging in "one long unfair and unscrupulous course of conduct." "The trial court's findings of fact and rulings of law will be upheld unless they lack evidentiary support or constitute clear error of law." Beer v. Bennett, 160 N.H. 166, 168-69 (2010) (quotation omitted); cf. Incase, Inc. v. Timex Corp., 421 F. Supp. 2d 226, 239 (D. Mass. 2006) (explaining that question of whether conduct is unfair or deceptive is a question of fact under Massachusetts Consumer Protection Act).

The CPA proscribes unfair or deceptive trade practices in general, and sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices. State v. Moran, 151 N.H. 450, 452 (2004). Here, it is the general proscription that is at issue. Although the general provision of the CPA is broadly worded, we have recognized that not all conduct in the course of trade or commerce falls within its scope. Id. "An ordinary breach of contract claim, for example, is not a violation of the CPA." George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 129 (2011) (quotation omitted).

5

"In determining which commercial actions not specifically delineated are covered by the act, we have employed the 'rascality' test." Id. "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. In addition to employing the rascality test, "we . . . look to the federal courts' interpretation of the Federal Trade Commission Act for guidance" when determining what actions are unlawful under the statute's general proscription. Moran, 151 N.H. at 452-53; see RSA 358-A:13 (2009).

> The Federal Trade Commission determines if actions are unfair or deceptive by inquiring: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

Moran, 151 N.H. at 453 (quotation omitted).

We have had limited occasion to interpret the CPA in the context of real estate transactions. Specifically, we have: (1) recognized that "[t]rade" and "commerce" as defined by the act "include[s] acts incidental to the sale of real estate," Snierson v. Scruton, 145 N.H. 73, 80-81 (2000); see RSA 358-A:1, II (2009); (2) considered whether a particular real estate transaction occurred "in the conduct of any trade or commerce," Hughes v. DiSalvo, 143 N.H. 576, 577-79 (1999) (quotation and emphasis omitted); and (3) determined whether conduct relating to the sale and development of condominiums is exempt from the act, Gilmore v. Bradgate Assocs., 135 N.H. 234, 236-37 (1992), overruled by Averill v. Cox, 145 N.H. 328, 332 (2000). However, we have only once considered whether particular acts incidental to the sale of real estate constituted "unfair or deceptive act[s] or practice[s]" under RSA 358-A:2. See Snierson, 145 N.H. at 81.

Here, when it adopted the advisory jury verdict, the trial court found that the general proscription of RSA 358-A:2 applied to Fat Bullies and Simmons's conduct. It reasoned:

> . . . Simmons showed up without any prior notice at [Runnymede] with Gould, who the Devenports did not know. Simmons introduced Gould as his attorney and displayed what Gould and Simmons both believed to be a binding legal document and cash deposit. The Devenports did not have a lawyer and Simmons did not suggest they retain one. Simmons, despite knowing the asking price was $800,000, produced a document . . . for signature

6

depicting the sale price as $700,000. He did not warn the Devenports ahead of time that he would be bringing a binding legal document, an attorney, or changing the price term of the proposal. He did not point out the change of term. He did not explain what an option was. He led the Devenports into believing that Fat Bullies would keep Runnymede as a horse farm and honor the Devenports' promise to [the former owner]. He showed interest in the horses, trophies and [the former owner], said he was interested in raising llamas and cows, and expressed a dream of having his grandchildren visit the farm. This conduct, the Court finds, was "unscrupulous" and unfair. When Simmons saw Bret [Devenport] at the gas station, he placed his hand on Bret's car or arm and threatened him. . . . This conduct was "oppressive" and unfair.

In ruling upon the Devenports' request for damages, the trial court made additional findings relevant to the Devenports' CPA claim. Specifically, the court found that Fat Bullies and Simmons violated the CPA by engaging in a "continuing course of conduct," which "beg[an] with an unfair attempt at contract formation" and included "threaten[ing] the Devenports with legal action, . . . sen[ding] demand letters, . . . br[inging] suit against the Devenports and the [Perkinses,] . . . [and] enact[ing] a contentious litigation strategy which had the effect of causing the Devenports to incur over $200,000 in legal fees over the course of more than four years" — all while knowing "that the Devenports were in financial straits." (Emphasis omitted.) The court described this conduct as "unscrupulous," "deceptive," and "unfair."

We agree with the trial court and the Devenports that a course of conduct can violate the CPA. See, e.g., Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 20 (2001). However, a series of acts only becomes a course of conduct violative of the CPA when the acts collectively constitute an "unfair or deceptive act or practice." RSA 358-A:2; see Milford Lumber Co., 147 N.H. at 20 (concluding misrepresentations to procure materials and use of same misrepresentations to avoid payment collectively constituted "course of deceptive acts and practices"); E. Microwave, Inc. v. Am. Private Line Servs., Inc., No. 912850, 1993 WL 818931, at *2 (Mass. Super. Ct. Oct. 6, 1993) (concluding defendants engaged in a "course of conduct" violating Massachusetts Consumer Protection Act when they "deliberately siphoned" funds owed to plaintiff out of "sham corporation" in "an intentional scheme to defraud" plaintiff). Based upon our review of the record, we hold that the trial court erred in finding that Fat Bullies and Simmons engaged in a course of conduct that was "unfair or deceptive" as contemplated by the CPA. RSA 358-A:2.

The record supports the trial court's determination that Fat Bullies and Simmons misrepresented their intentions regarding Runnymede. However, we conclude that the misrepresentation of a buyer's intentions regarding the

7

future use of real property does not, as a matter of law, rise to the level of rascality necessary for it to constitute an "unfair or deceptive act or practice." RSA 358-A:2.  Under the statute of frauds, oral agreements restricting the use of real property are generally unenforceable.  See RSA 506:1 (2010) (statute of frauds); Tibbetts v. Tibbetts, 66 N.H. 360, 361-62 (1890) (reasoning that oral agreement restricting use of land could not create a negative easement); Annotation, Oral Agreement Restricting Use of Real Property as within Statute of Frauds, 5 A.L.R.2d 1316, 1318 (1949) (noting that "a marked majority of the cases on th[e] subject have concluded that an oral agreement restricting the use of real property is within the application and operation of . . . the statute of frauds" (citing Tibbetts)).  We conclude that someone inured to the rough and tumble world of real estate transactions would be aware of the statute of frauds.  Although the Devenports may not have been aware of the statute of frauds, we apply the rascality test objectively.  See Mulligan v. Choice Mortgage Corp. USA, No. CIV. 96-596-B, 1998 WL 544431, at *11 (D.N.H. Aug. 11, 1998).  Because someone inured to the rough and tumble world of real estate transactions would know that an oral agreement restricting the use of real property is unenforceable, the misrepresentation of one's intent to abide by such an agreement is neither "unfair" nor "deceptive" under RSA 358-A:2.  Cf. Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1989) (finding breach of oral lease agreement that "was not enforceable because of the Statute of Frauds" did not satisfy rascality test); cf. Snierson, 145 N.H. at 75, 81 (holding that plaintiffs sufficiently stated a claim for relief under the CPA when they alleged that defendants, as agents of sellers of real property, "misrepresented and withheld facts relating to the [property's] septic system and various other deficiencies in the property in a seller's disclosure form and in oral communications").  Although the misrepresentation encouraged the Devenports to sell Runnymede to Fat Bullies, a misrepresentation does not rise to the level of rascality necessary to establish a consumer protection violation merely because it encourages a sale.  See Tagliente v. Himmer, 949 F.2d 1, 7 (1st Cir. 1991) (concluding, as a matter of law, that rascality test not met when seller misrepresented "that the property had not been previously marketed for sale, and that there were other buyers ready and willing to pay more than the agreed upon . . . purchase price").

Moreover, even if we were to look outside the context of real property transactions, the nature and circumstances of Fat Bullies and Simmons's misrepresentation differentiate it from the types of misrepresentations we have previously found to fall within the CPA's general proscription.  Because the jury found that there was no contract, the misrepresentation was not made to avoid an enforceable contractual obligation.  Cf. George, 162 N.H. at 126, 129-30 (rascality test met where defendant entered into contract with plaintiff real estate developer for construction of road, accepted deposit from plaintiff for bridge needed to complete road, and then misrepresented status of his performance under the contract); Becksted v. Nadeau, 155 N.H. 615, 616, 619-20 (2007) (trial court erred in ruling no rational juror could have found

8

rascality test met because rational jury could have found that defendants intentionally sent plaintiffs inflated legal bill to use as leverage in dispute concerning law firm's payment obligation under construction contract); Moran, 151 N.H. at 450-51, 453-54 (rascality test met when trial court could have reasonably found that defendant entered into construction contract with homeowner then used misrepresentations to induce homeowner to pay in advance for construction materials "at a time when he clearly did not intend to perform the work"). The misrepresentation was not used to obtain a benefit only to later be used to disclaim liability. Cf. Milford Lumber Co., 147 N.H. at 19-20 (affirming trial court's finding of CPA violation when defendants "made intentionally vague representations regarding their relationship with [a third party] to facilitate the use of [the third party's] account with the plaintiff to procure lumber," and then "used those same misrepresentations as a basis for disclaiming liability").

Viewing Fat Bullies and Simmons's misrepresentation in conjunction with the remainder of their course of conduct does not alter our determination. Even taken together, the acts of showing up unannounced with an attorney and an option agreement, not recommending that the Devenports obtain legal counsel, attempting to negotiate price, not explaining the meaning of the language contained in the draft agreement, threatening and attempting to enforce an option agreement, and pursuing a contentious litigation strategy would not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce." George, 162 N.H. at 129; see Barrows v. Boles, 141 N.H. 382, 390 (1996) ("'[S]elfish bargaining and business dealings will not be enough to justify a claim for damages' under the Consumer Protection Act." (quoting Eastern Motor Inns, Inc. v. Ricci, 565 A.2d 1265, 1274 (R.I. 1989))); cf. Monotype Imaging Inc. v. Deluxe Corp., 883 F. Supp. 2d 317, 323 (D. Mass. 2012) (concluding that bringing of lawsuit regarding "a reasonable disagreement over the meaning of contract terms" was not consumer protection violation); Trenwick America Reinsurance Corp. v. IRC, Inc., 764 F. Supp. 2d 274, 308 (D. Mass. 2011) (considering litigation tactics part of course of conduct in violation of consumer protection law when offending party utilized "moving target [litigation] strategy" and engaged in "discovery abuses"). We cannot conclude that the subject conduct offends established public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury. See Moran, 151 N.H. at 453.

For these reasons, we reverse the trial court's ruling on the Devenports' CPA claim and its award of attorney's fees to the Devenports as damages under the CPA. In light of this determination, we need not address Fat Bullies and Simmons's remaining arguments regarding the CPA.

9

B.  Tortious Interference Claim

Next, Fat Bullies, Simmons, and Gould argue that the trial court erred in granting summary judgment to the Perkinses on Fat Bullies' claim seeking monetary relief for the Perkinses' purported tortious interference with the option agreement.  They assert that "[t]he trial judge did not set forth the facts in a light most favorable to Fat Bullies" and erroneously made credibility determinations that should have been left for the jury.  (Emphasis omitted.)  They contend that, "at a minimum, the trial court should have concluded that there were material facts in dispute."  (Emphasis omitted.)

In its order granting summary judgment to the Perkinses, the trial court ruled that Fat Bullies "failed to present any evidence showing a genuine issue of material fact that the Perkins[es] intentionally and improperly interfered" with the option agreement.  (Quotation omitted.)  Assuming, without deciding, that the trial court erred in making this determination, in light of the jury's finding that there was no contract, we conclude that any error was harmless. See McNair v. McNair, 151 N.H. 343, 355 (2004) (concluding any error was harmless when we "identified other grounds that independently compel the conclusion" reached by the trial court); Barrows, 141 N.H. at 392 (explaining that, to succeed on claim for tortious interference with contractual relations, plaintiff must prove, among other things, that it "had a contractual relationship with a third party"); Attorney General v. Morgan, 132 N.H. 406, 408 (1989) (explaining that "[a] harmless error is an error that does not affect the outcome," and concluding that, "[a]lthough the trial judge erred in entering a final judgment at the arbitration hearing, the outcome of the case was not affected" (quotation omitted)).  Accordingly, we affirm the trial court's grant of summary judgment to the Perkinses on Fat Bullies' tortious interference with contractual relations claim.

C.  Award of Attorney's Fees and Costs to the Perkinses

Fat Bullies, Simmons, and Gould next argue that the trial court erred by awarding attorney's fees and costs to the Perkinses on grounds of bad faith. They contend, among other things, that their filing of the two tortious interference claims against the Perkinses was, "at most, a considered but good faith mistake."  In opposition, the Perkinses argue that "the facts found by the trial court provide ample support for the court's determination that [the tortious interference claims] were brought in bad faith as a continuation of the course of unfair, unscrupulous, and oppressive conduct that Fat Bullies and Simmons directed against the Devenports."  (Quotations omitted.)

The general rule in New Hampshire is that parties pay their own attorney's fees.  In the Matter of Mallett & Mallett, 163 N.H. 202, 211 (2012). However, we have recognized exceptions to this rule.  Id.  A court may award attorney's fees when specifically authorized by statute.  Id.; see, e.g., RSA 358-

10

A:10, I (2009).  Otherwise, an award of attorney's fees must be grounded upon an agreement between the parties or a judicially-created exception to the general rule.  Mallett, 163 N.H. at 211.  "Underlying the rule that the prevailing litigant is ordinarily not entitled to collect his counsel fees from the loser is the principle that no person should be penalized for merely defending or prosecuting a lawsuit."  Harkeem v. Adams, 117 N.H. 687, 690 (1977).

"As to judicially-created exceptions, attorney's fees have been awarded in this State based upon two separate theories: bad faith litigation and substantial benefit."  Frost v. Comm'r, N.H. Banking Dep't, 163 N.H. 365, 377-78 (2012) (quotation omitted).

> Under the bad faith litigation theory, an award of attorney's fees is appropriate [when] one party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, [when] the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and [when] it should have been unnecessary for the successful party to have brought the action.

Id. at 378 (quotation omitted).  "When attorney's fees are awarded against a private party who has acted in bad faith, the purpose is to do justice and vindicate rights, as well as to discourage frivolous lawsuits."  Jesurum v. WBTSCC Ltd. Partnership, 169 N.H. ___, ___, 151 A.3d 949, 961 (2016) (quotation omitted).

"We will not overturn the trial court's decision concerning attorney's fees absent an unsustainable exercise of discretion."  Frost, 163 N.H. at 377.  "To warrant reversal, the discretion must have been exercised for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the objecting party."  Id.  "In evaluating the trial court's ruling on this issue, we acknowledge the tremendous deference given a trial court's decision regarding attorney's fees."  Id. (quotation omitted).  "If there is some support in the record for the trial court's determination, we will uphold it."  Id.

Here, the trial court found that Fat Bullies brought its tortious interference claims against the Perkinses "in bad faith," explaining that Fat Bullies' initiation of the lawsuit against the Perkinses was "part of th[e] course of conduct" that it ruled violative of the CPA.  It reasoned that Fat Bullies brought the tortious interference claims against the Perkinses "[p]erhaps because [it] feared that the Devenports did not have sufficient money to pay any judgment it sought, and perhaps as a litigation strategy."  It explained that the claims against the Perkinses "should never have been brought" because Fat Bullies: (1) failed to state a claim for tortious interference with contractual relations seeking equitable relief; and (2) failed to "produce[] any evidence that the Perkins[es] had tortiously interfered with the [o]ption."  Based upon our

11

review of the record, we conclude that the trial court unsustainably exercised its discretion to the prejudice of Fat Bullies.  Id.

The trial court appeared to offer three bases for its finding of bad faith — none of which properly supports such a finding.  First, the trial court concluded that Fat Bullies' initiation of the lawsuit against the Perkinses was "part of th[e] course of conduct" that it earlier ruled violative of the CPA.  As discussed above, as a matter of law, Fat Bullies and Simmons's conduct did not violate the CPA.

Next, the trial court noted the possibility that Fat Bullies brought suit against the Perkinses "as a litigation strategy" or "because [it] feared that the Devenports did not have sufficient money to pay any judgment."  However, the trial court's use of the term "perhaps" indicates that it did not make any factual findings about Fat Bullies' motive in bringing suit against the Perkinses.  See Webster's Third New International Dictionary 1679 (unabridged ed. 2002) (defining "perhaps" as "possibly but not certainly: MAYBE"); Fischer v. Superintendent, Strafford County House of Corrections, 163 N.H. 515, 519 (2012) (stating that we interpret trial court orders de novo).  Additionally, even if the trial court had made such factual findings, the trial court did not articulate, the Perkinses do not argue, and we cannot discern, how a plaintiff engages in bad faith litigation merely by bringing suit against a solvent defendant when it fears that it may not be able to collect on a judgment against another defendant.

Finally, the trial court pointed out that one of Fat Bullies' tortious interference claims failed to survive a motion to dismiss, and the other failed to survive a motion for summary judgment.  Although the trial court's order is not clear, we construe it as finding that the claims against the Perkinses were patently unreasonable.  See Grenier v. Barclay Square Commercial Condo. Owners' Assoc., 150 N.H. 111, 117 (2003) (recognizing that attorney's fees may be awarded to "those who are forced to litigate against an opponent whose position is patently unreasonable" (quotation omitted)); Glick v. Naess, 143 N.H. 172, 175 (1998) (describing a party's unreasonableness as "a variety of bad faith" (quotation omitted)).  "A claim is patently unreasonable when it is commenced, prolonged, required or defended without any reasonable basis in the facts provable by evidence, or any reasonable claim in the law as it is, or as it might arguably be held to be."  Glick, 143 N.H. at 175 (quotation omitted).

Based upon our review of the record, we cannot conclude that Fat Bullies' tortious interference claims were patently unreasonable.  Although the Perkinses argue that "the trial court ruled [that] Fat Bullies had no evidence to support its claims against the Perkins[es]," the trial court made no such ruling.  Rather, based upon its review of the summary judgment record, the trial court concluded only that there was insufficient evidence to create a genuine issue of material fact as to one of the elements of a tortious interference claim —

specifically, interference.  Further, in support of its argument that the Perkinses interfered with the option agreement, Fat Bullies submitted telephone records indicating that there were "frequent phone calls" between the Perkinses, the Devenports, and the Devenports' attorney "in the days leading up to the cancellation of the [o]ption [a]greement," and evidence that the Runnymede Farm Homeowners Association held a meeting at the Perkinses' home in October of 2010, at which the members voted "to eliminate an unused secondary driveway easement and to place ownership of . . . Runnymede['s] grazing rights in an LLC."  In light of this evidence, we cannot conclude that Fat Bullies' claims that the Perkinses interfered with the option agreement were "without any reasonable basis in the facts provable by evidence."  Glick, 143 N.H. at 175 (quotation omitted).  Under such circumstances, an award of fees to the Perkinses would run counter to the principle that "no person should be penalized for merely defending or prosecuting a lawsuit."  Harkeem, 117 N.H. at 690.

In sum, we conclude that none of the proffered justifications provide a proper basis for the trial court's finding of bad faith litigation.  Accordingly, we hold that the trial court unsustainably exercised its discretion in awarding attorney's fees and costs to the Perkinses under Harkeem.

D.  Reasonableness of Fees and Costs

Fat Bullies, Simmons, and Gould next challenge the trial court's determinations concerning the reasonableness of the attorney's fees awarded to the Devenports and to the Perkinses.  The parties raise various arguments relating to this issue.  However, because we have reversed the trial court's awards of attorney's fees and costs to the Devenports and the Perkinses, we find it unnecessary to address these arguments.

E.  Gould's and Simmons's Personal Liability

Fat Bullies, Simmons, and Gould next argue that the trial court erred by determining that both Simmons and Gould are personally liable for the payment of the Perkinses' attorney's fees and costs.  Because we have concluded that the trial court erred in awarding attorney's fees and costs to the Perkinses, we need not address this issue.

F.  Remaining Issues

Fat Bullies, Simmons, and Gould also argue that the trial court erred by quashing Fat Bullies' deposition subpoena duces tecum and limiting the cross-examination of one of the Devenports' witnesses at trial.  They appear to assert that the evidence sought by the subpoena and the evidence that would have been elicited on cross-examination was relevant to the court's assessment of Fat Bullies' tortious interference claim against the Perkinses seeking monetary

damages. They claim that the trial court's error "led to a summary judgment adverse to Fat Bullies due to a lack of evidence of any interference." (Quotation omitted.) Because we have concluded that any error in granting summary judgment to the Perkinses was harmless in light of the jury's finding that there was no enforceable contract with which to interfere, we need not consider these arguments.

Finally, any issues raised in the defendant's notice of appeal, but not briefed, are deemed waived. See Town of Barrington v. Townsend, 164 N.H. 241, 251 (2012).

Affirmed in part; reversed in part; and remanded.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.