NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2017-0674

THE STATE OF NEW HAMPSHIRE

v.

PRICELINE.COM, INCORPORATED n/k/a THE PRICELINE GROUP, INC. <u>&</u> <u>a</u>.

Argued: January 10, 2019
Opinion Issued: March 8, 2019

<u>Gordon J. MacDonald</u>, attorney general (<u>Philip B. Bradley</u>, assistant attorney general, and <u>K. Allen Brooks</u>, senior assistant attorney general, on the brief), <u>Crongeyer Law Firm, P.C.</u>, of Atlanta, Georgia (<u>John W. Crongeyer</u> on the brief and orally), and <u>Bird Law Group</u>, of Atlanta, Georgia (<u>Paul I. Hotchkiss</u> and <u>Alexandria E. Seay</u> on the brief), for the State.

<u>Rath Young and Pignatelli, PC</u>, of Concord (<u>Christopher J. Sullivan</u>, <u>Michael S. Lewis</u>, and <u>Richard W. Head</u> on the brief), <u>Bradley Arant Boult Cummings LLP</u>, of Birmingham, Alabama (<u>Anne Marie Seibel</u> and <u>Jennifer J. McGahey</u> on the brief, and <u>Ms. Seibel</u> orally), <u>Kelly Hart & Hallman LLP</u>, of Fort Worth, Texas (<u>Brian Stagner</u> and <u>Scott R. Wiehle</u> on the brief), and <u>Freeborn & Peters LLP</u>, of Chicago, Illinois (<u>Jeffrey A. Rossman</u> on the brief), for the defendants.

HICKS, J.  The State appeals an order of the Superior Court (McNamara, J.) following a ten-day bench trial granting judgment to the defendants, the direct or indirect subsidiaries of Priceline.com, Inc., Orbitz, LLC, Expedia, Inc., and Travelocity.com, LLP, alleging that: (1) they violated the New Hampshire Meals and Rooms Tax Law, see RSA ch. 78-A (2012 & Supp. 2018), by failing to remit meals and rooms taxes on transactions with hotel consumers and by bundling money collected from consumers as taxes with other amounts; and (2) the bundling of taxes with other fees also violated the New Hampshire Consumer Protection Act (CPA), see RSA ch. 358-A (2009 & Supp. 2018).  We affirm.

I

Except where noted, the trial court found the following facts, which, for the most part, the State does not dispute on appeal.  The defendants are online travel companies (OTCs).  Commentators have observed that OTCs "attract consumers by aggregating information that allows travelers to sort through hotels and book a room on a central website."  Chantelle L. Lytle, Note, Groupon and Expedia:  A Comparison of Two Modern Online Trends Creating a Parallel Tax Inquiry, 6 Elon L. Rev. 217, 233 (2014) (quotation and brackets omitted).  Those websites allow "consumers to easily compare hotels based on different criteria (including price, location, and customer ratings) and at the same time book a reservation and pay for it."  Id. (quotation omitted).  Commentators have opined that OTCs benefit travelers but "also benefit hotels, allowing them to reach a market that they otherwise would not reach."  Id. at 234 (quotation and ellipsis omitted).  The primary function of OTCs is to relay information between travelers and hotels.

Generally speaking, OTCs use either the "agency" or the "merchant" model to conduct business.  Under the agency model, the consumer pays the hotel directly for the room.  See id.  The hotel then pays the OTC a commission for the booking and remits to the State the meals and rooms tax on the full amount received from the consumer.  See id.  The State has no claims in this litigation related to the use of the agency model.  Rather, this litigation focuses upon only the use of the merchant model.

Under the merchant model, the consumer pays the OTC, not the hotel, for the room.  See Village of Bedford Park v. Expedia, Inc., 876 F.3d 296, 299 (7th Cir. 2017).  The OTC and the hotel have a contract under which the hotel offers rooms to the OTC at a discounted rate, i.e., a percentage of the hotel's lowest published rate, and the OTC displays information about the hotel on its website so as to allow consumers to book room reservations through the website.  The discounted rate is referred to as the "net" or "wholesale" rate.  See Lytle, supra at 235.  According to one witness, under the merchant model, the OTC transfers to the hotel information that a consumer enters when booking a hotel room reservation on the OTC's website (e.g., destination, dates of travel,

number of rooms) and then displays for the consumer real time rates, availability, and the hotel's associated terms and conditions for occupancy.

When the consumer books a hotel room reservation through an OTC website under the merchant model, the OTC collects payment from the consumer using the consumer's credit card. The OTC, therefore, is the merchant of record. The hotel then has a certain number of days in which to send an invoice to the OTC for the net rate of the hotel room and the meals and rooms tax on that rate. See id.

Although the hotels offer hotel rooms to the OTCs at a discounted rate (the net or wholesale rate), the OTCs may offer those rooms to consumers at a higher rate (the retail rate). See id. The hotels, however, insist upon "parity" in all merchant model transactions, which means that the ultimate price paid by the consumer must be no lower than the price the hotel advertises as its "best available rate." A hotel's "best available rate" refers to the lowest rate for the room that the hotel offers to the public. For example, if the hotel's lowest published rate is $100, and the hotel allows the OTC a discounted rate of 20% lower than the lowest published rate (or $80) for the room, then the OTC cannot offer it to a consumer for less than $80 divided by .80, which is $100.

The total amount an OTC charges the consumer (the retail amount) includes the retail room rate, an estimate of the meals and rooms tax on the net rate, and a service fee. See id. It may include other charges as well. The OTC does not disclose to the consumer the estimated meals and rooms tax included in the retail amount. However, the OTC does disclose the fact that taxes and fees are bundled into a charge separate from the room rate. As one OTC informs customers on its website:

> Amounts displayed in the "Taxes and Fees" line for prepaid hotel transactions include an estimated amount we expect the hotel to bill for applicable taxes, government fees and other charges that the hotels must pay to the government. In addition, the "Taxes and Fees" line includes a fee we charge and retain in exchange for the services we provide in facilitating your transaction with the hotel supplier.

This litigation concerns the meals and rooms tax paid on hotel room reservations using the merchant model. In a typical merchant model transaction, the OTC pays the hotel the amount of tax that the hotel owes on the net or wholesale rate. The OTC does not pay the meals and rooms tax based upon the retail rate. Nor does the OTC pay meals and rooms tax on any of the other OTC fees or surcharges that the consumer may pay. Moreover, if, for some reason, the consumer does not keep his or her reservation, then the hotel does not send an invoice to the OTC, and the OTC may retain all of the

funds collected for the reservation, paying no meals and rooms tax on those funds.

As an example, when an OTC and a hotel agree to a wholesale rate of $80, and the OTC charges consumers a rate of $100, the 9% meals and rooms tax on the wholesale rate is $7.20 (.09 x $80). See RSA 78-A:6, I (2012). Assuming that, in addition to the tax recovery fee, the OTC has a service fee of $2.80, the OTC then charges the consumer a total amount of $110. The retail amount includes the retail rate of $100 plus $10 in fees ($7.20 for the estimated meals and room tax and $2.80 for the service fee). Within an agreed upon number of days, the hotel invoices the OTC for $80 plus the $7.20 for the meals and rooms tax and remits $7.20 to the State; the OTC keeps the remaining $22.80 from the retail amount paid by the consumer, and pays no meals and rooms taxes on it. See Lytle, supra at 235-36. If the hotel fails to invoice the OTC within the agreed-upon number of days, the OTC is entitled to retain the entire $110 paid by the consumer.

The parties dispute whether the OTCs are subject to the meals and rooms tax law. The trial court ruled that OTCs are not subject to the law because they are not "operators" of hotels. See RSA 78-A:3, IV (2012). The trial court decided that, according to the statutory definition of the term, to be an "operator" requires having possession or control of a hotel's physical structure. See id. Because OTCs have no possessory interest in, or control over, the hotels with which they contract, the court concluded that they are not "operators" under RSA chapter 78-A.

The trial court also decided that the OTCs are not "operators" under the plain meaning of the term, which the court concluded "suggests day-to-day management of the hotel property." Although the State had argued "in a desultory way that the OTCs exercise significant control over many aspects of day-to-day hotel operations," because they have "access to central reservation systems, provid[e] reservation confirmation numbers, and rat[e] possible properties," the trial court ruled that argument "untenable" because "[s]uch functions are entirely consistent with the OTCs' role as a distribution channel." (Quotations omitted.)

Although the State contended that the OTCs buy, sell, and resell hotel rooms, the trial court found that "the evidence conclusively establishes that the actual business practices of the OTCs do not involve buying or selling hotel rooms."[1] Rather, the court found, "the OTCs simply contract with consumers for the service of facilitating reservations." The court explained:

---

[1] To the extent that the State challenges this factual finding, we conclude that it is supported by the record and, therefore, uphold it. See O'Malley v. Little, 170 N.H. 272, 275 (2017).

4

The testimony given at trial and in the depositions introduced at trial demonstrates that under the merchant model, the OTCs are merely acting as a distribution channel to facilitate reservations for the hotel. . . . [T]he OTCs [are allowed] to access the hotel reservation systems, but [are not given] any control over which room a consumer will be assigned to. Critically, the hotel with whom an OTC contracts . . . always maintains the right to not allow a consumer to use a room. . . . Moreover, the OTCs are not responsible for cleaning rooms, maintaining the hotel, or providing services of any kind to guests.

The trial court rejected the State's alternative argument based upon regulations promulgated by the New Hampshire Department of Revenue Administration (DRA). See N.H. Admin. R., Rev 701.15. Additionally, the trial court rejected the State's assertion that the OTCs violate the CPA by bundling estimated meals and rooms tax with other fees.

II

On appeal, the State argues that the trial court erred when it determined that the OTCs are not subject to the meals and rooms tax law because they are not "operators," and when it failed to find that bundling taxes with other charges violated the CPA. We review these questions of law de novo. See State v. Exxon Mobil Corp., 168 N.H. 211, 222 (2015).

Resolving the State's appeal issues requires that we engage in statutory interpretation. In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Conduent State & Local Solutions v. N.H. Dep't of Transp., 171 N.H. ___, ___ (decided October 16, 2018) (slip op. at 5). "[T]he view that statutes imposing taxes are, as a matter of course, to be strictly construed, does not have judicial sanction in this jurisdiction." Appeal of Town of Pelham, 143 N.H. 536, 538 (1999) (quotation omitted). Rather, we apply our customary "basic tenets of statutory interpretation" when construing such statutes, which means that "we first examine the language of the text; to the extent that it is not specifically defined, we give the language its plain and ordinary meaning." Id. (quotations omitted); see Conduent, 171 N.H. at ___ (slip op. at 5).

We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Conduent, 171 N.H. at ___ (slip op. at 5). We construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. Id. This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be

advanced by the statutory scheme.  Id.; see Appeal of Town of Pelham, 143 N.H. at 538 (explaining that we examine a tax statute's "language in the light of its purposes and objectives" (quotation and ellipsis omitted)).

Absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent.  Conduent, 171 N.H. at ___ (slip op. at 5). However, "an ambiguous tax statute will be construed against the taxing authority rather than the taxpayer."  Appeal of John Denman, 120 N.H. 568, 571 (1980) (per curiam).

To the extent that the State challenges the trial court's factual findings, we will uphold those findings unless they lack evidentiary support or are legally erroneous.  O'Malley v. Little, 170 N.H. 272, 275 (2017).  We do not decide whether we would have ruled differently than the trial court, but rather, whether a reasonable person could have reached the same decision as the trial court based upon the same evidence.  Id.  Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence.  Id. Nevertheless, we review the trial court's application of the law to the facts de novo.  Id.

A

We first address whether the OTCs are "operators" under the meals and rooms tax law.  See RSA 78-A:3, IV.  RSA 78-A:6, III requires an "operator" to collect meals and rooms taxes and remit them to the State.  RSA 78-A:6, III (2012).  An "operator" must also register with the DRA the name and address of each place of business in which it "operates" a hotel and must obtain a "meals and rentals license" for each such place.  RSA 78-A:4, I (2012).  RSA 78-A:4, III provides that "[n]o person shall engage in . . . renting rooms . . . without first obtaining [such a] license."  RSA 78-A:4, III (2012).  The word "person" is defined as "any individual, combination of individuals, firm, partnership, society, association, joint stock company, corporation, or any of the foregoing acting in a fiduciary or representative capacity, whether appointed by the court or otherwise."  RSA 78-A:3, II (2012).

For the purposes of the tax as it relates to hotels, the legislature has defined an "operator" as "any person operating a hotel, . . . whether as owner or proprietor or lessee, sublessee, mortgagee, licensee, or otherwise."  RSA 78-A:3, IV.[2]  The plain meaning of the transitive verb "to operate" means "to manage

---

[2] The term "operator" as it relates to meals is defined as "any person . . . charging for a taxable meal."  RSA 78-A:3, IV.  The term as it relates to motor vehicle rentals is defined as "any person . . . receiving gross rental receipts."  Id.; see RSA 78-A:3, XVI (2012) (defining the phrase "gross rental receipts" as the "value received or promoted as consideration to the owner of a motor vehicle for rental of the vehicle").  This opinion focuses exclusively on the definition of the term "operator" as it relates to hotels.

and put or keep in operation whether with personal effort or not," as in "operated a grocery store." Webster's Third New International Dictionary 1581 (unabridged ed. 2002). Thus, in context, an "operator" for the purposes of the meals and rooms tax law as it applies to hotels, "is, like an owner or a manager, someone who generally oversees the business of running a hotel." Village of Bedford Park, 876 F.3d at 304 (decided under Illinois law).

Under the plain meaning of the term, the OTCs do not "operate" hotels. As the trial court found, and as the record supports, the OTCs do not manage or control the hotels. Nor do they own, staff, or maintain the hotels. They have no involvement in the day-to-day management or running of the hotels. As one witness testified:

> So [the hotel company] actually owns, operates, manages hotels, so they provide the physical accommodations to travelers, and in that context, they have staff that [provide] the full gamut of things that you would commonly see in [a] hotel, so the front desk, the food and beverage [service] to cleaning services and whatnot. [The OTC] doesn't do any of those [things]. [It] is an electronic service intended to provide travel information to travelers who are seeking to make hotel reservation requests.

As another witness testified:

> The hotels . . . have to maintain the property . . . . They have to maintain the electricity; the lawn care; [the] cleanliness of the hotel. They have to turn the rooms or clean the rooms and prepare them for each guest. They have to check-in the guest. They have to manage things like food and beverage if they have a restaurant; numerous things that they have to do to continue to maintain the hotel.

That witness agreed that the OTC has no involvement "in the day-to-day operations of any hotels," does not "own any hotel rooms," does not "own any hotels," and does not "ever physically possess any hotel rooms."

Courts in other jurisdictions have likewise concluded that OTCs are not hotel "operators" for the purposes of similar tax laws. See, e.g., Pitt County v. Hotels.com, L.P., 553 F.3d 308, 310, 313 (4th Cir. 2009); City of Goodlettsville, Tenn. v. Priceline.com, 844 F. Supp. 2d 897, 899, 902-03, 912 (M.D. Tenn. 2012); Montana Dept. of Revenue v. Priceline.com, 354 P.3d 631, 633, 635 (Mont. 2015).

The State argues that the OTCs satisfy the dictionary definition of the term "operator" because they provide "hotel-related services" such as inspecting and rating properties, advertising, marketing, determining consumer

7

prices, accessing a hotel's central reservation system, calculating and collecting taxes, collecting payments, providing reservation confirmation numbers, developing and enforcing cancellation policies, and issuing refunds. However, the fact that the OTCs "perform one set of functions that a hotel does—making room reservations, processing financial transactions, and handling customer service with respect to those transactions[,] . . . does not transform them into operators of hotels." Village of Bedford Park, 876 F.3d at 304. "We would not say that when a hotel contracts with a cleaning service that orders supplies and hires, schedules, and pays workers, the cleaning service becomes an operator of the hotel." Id.

The State also asserts that the OTCs are "operators" because they "collect payment from a consumer for the consumer's right to occupy a hotel room." The State contends that the meals and rooms tax law "plainly requires that any person collecting the tax must be an 'operator,' and must be licensed by the [DRA] to do so." The State observes, correctly, that the legislature defined the word "person" broadly and extrapolates from this that the legislature intended the meals and rooms tax law to apply to anyone involved in a hotel room transaction. The State contends that the legislature intended the meals and rooms tax law to apply to a consumer's hotel booking "regardless of whether one company handles all aspects of the transaction[ ], as in direct hotel bookings, or whether two or more parties are involved, as in travel agent or OTC bookings. The legislature covered all possibilities when it defined 'person' and 'operator' broadly."

The legislature did not craft the meals and rooms tax law as broadly as the State suggests. The State views the definition of "person" in isolation, rather than in context. The only "persons" who are subject to the meals and rooms tax are those who are also "operators," meaning that they "operate" a hotel. See RSA 78-A:3, IV. Although the legislature could have defined "operator" to refer to anyone who collects payment from a consumer, it did not do so. It limited the definition of "operator" to those who actually "operate" hotels. Only hotel operators must collect and remit the meals and rooms tax. RSA 78-A:6, III. Only hotel operators must be licensed by the DRA and submit to the DRA the name and address of each hotel property in operation. RSA 78-A:4, I. Absent direction from the legislature, we decline the State's invitation to interpret the word "operator" more broadly than the plain language requires. See Conduent, 171 N.H. at ___ (slip op. at 5).

The State next argues that the OTCs are "operators" pursuant to Rule 701.15, which provides:

> "Operator" means "operator" as defined in RSA 78-A:3, IV and includes a person:

(a) Offering sleeping accommodations for rent to the general public, including owners of private homes who offer sleeping accommodations for rent to the general public;

. . . .

(d) Who acts in the capacity of an agent, whether as lessee, sublessee, mortgagee, licensee or otherwise, for an owner in renting sleeping accommodations . . . .

N.H. Admin. R., Rev 701.15. The State contends that the OTCs meet this definition either because they "offer[ ] sleeping accommodations for rent to the general public" themselves or because they partner with, or are the agents of, hotels that offer such accommodations.

The trial court rejected the State's argument both legally and factually. As a matter of law, the trial court determined that, because Rule 701.15 "cannot add to, detract from, or modify" the statute it is intended to implement, "[f]or the [meals and rooms tax] to apply, an agent must still be a person operating a hotel." (Quotation omitted.) In addition, based upon the evidence at trial, the trial court found the OTCs do not, in fact, either offer sleeping accommodations for rent to the general public or act as agents for the hotels. Specifically, the trial court found that "the actual business practices of the OTCs do not involve buying or selling hotel rooms." Nor does it involve the leasing of rooms. The court determined that "[t]he hotels, and not the OTCs, grant the right to occupancy to the traveler, and do so only after the traveler arrives at the hotel, satisfies the hotel's terms and conditions, and the hotel determines that a room is actually available." The trial court stated that "the testimony at trial established that the OTCs and the hotels are not partners, but are rather competitors."

The State has failed to persuade us that the trial court's legal conclusion is wrong, see Appeal of Anderson, 147 N.H. 181, 183 (2001), or that its factual findings are legally erroneous or lack support in the record, see O'Malley, 170 N.H. at 275. Accordingly, we uphold its determination that the OTCs are not "operators," notwithstanding Rule 701.15.

The State contends that we owe "substantial deference" to the DRA's interpretation of RSA 78-A:3, IV and that, because the DRA's interpretation "is longstanding," it "demonstrates the intent of the Legislature through [the doctrine of] administrative gloss." (Emphasis omitted.) However, we accord "substantial deference" to an administrative agency's interpretation of a statute only when that statute is "of doubtful meaning." Grand China v. United Nat'l Ins. Co., 156 N.H. 429, 434 (2007) (quotation omitted). Similarly, the administrative gloss doctrine applies only when a statutory provision is

ambiguous.[3]  Petition of Kalar, 162 N.H. 314, 322 (2011) (noting that "[l]ack of ambiguity in a statute or ordinance . . . precludes application of the administrative gloss doctrine").  Here, the State has failed to demonstrate that the statutory definition of "operator" is ambiguous or otherwise of doubtful meaning.

The State also argues that deference is owed "to the [DRA's] longstanding interpretation and practice of requiring that all hotel customers pay taxes on the total consideration they paid to obtain the rights to their room, regardless of whether they paid a hotel, an offline travel agent, or an online travel agent." The trial court did not rule upon that issue because it had no need to do so. Having decided that the OTCs are not operators within the meaning of the meals and rooms tax law, it was not necessary for the trial court to determine whether, even if the OTCs were subject to that law, they would violate it by paying to the hotels the meals and rooms tax based upon the net rate, instead of upon the retail amount paid by the consumer.

We, too, need not decide this issue.  Accordingly, we leave for another day whether the meals and rooms tax should be imposed upon the retail amount paid by the consumer and, if so, whether the State has any remedy against the hotels and/or the hotels have any remedy against the OTCs to recover amounts owed.  See RSA 78-A:3, VIII(a) (2012) (defining rent as "[t]he consideration received for occupancy valued in money, whether received in money or otherwise, including all receipts, cash, credits, and property, or services of any kind or nature, and also any amount for which the occupant is liable for the occupancy without any deduction of any kind").

B

We next briefly consider the State's assertion that the trial court erred by failing to find that the OTCs violate the CPA by bundling taxes with other amounts so that the amount of taxes paid is not itemized for the consumer. The CPA proscribes unfair or deceptive trade practices in general, and sets forth a list of 17 specific types of conduct that qualify as unfair or deceptive trade practices.  See Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017); see also RSA 358-A:2 (Supp. 2018).  Here, the general proscription is at issue.  See Fat Bullies Farm, LLC, 170 N.H. at 24.  "In determining which commercial actions not specifically delineated are covered by the act, we have employed the 'rascality' test."  Id. (quotation omitted).  Under that test, "the

---

[3] "The doctrine of administrative gloss is a rule of statutory construction."  Petition of Kalar, 162 N.H. 314, 321 (2011).  "Administrative gloss is placed upon an ambiguous clause when those responsible for its implementation interpret the clause in a consistent manner and apply it to similarly situated applicants over a period of years without legislative interference."  Id. (quotation omitted).  "If an administrative gloss is found to have been placed upon a clause, the agency may not change its de facto policy, in the absence of legislative action, because to do so would, presumably, violate legislative intent."  Id. (quotations omitted).

objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Id. (quotation omitted).

We also look to the federal courts' interpretation of the Federal Trade Commission Act for guidance. Id.; see RSA 358-A:13 (2009). The Federal Trade Commission determines whether acts are unfair or deceptive by examining whether the practice: (1) "without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness"; (2) "is immoral, unethical, oppressive, or unscrupulous"; (3) "causes substantial injury to consumers" (or competitors or other business people). Fat Bullies Farm, LLC, 170 N.H. at 24 (quotations omitted).

The trial court ruled that the OTCs do not violate the CPA by bundling taxes with other fees, in part, because the OTCs disclose this fact to consumers. See Davis Frame Co., Inc. v. Reilly, No. Civ. 05-CV-160-SM, 2006 WL 435454, at *7 (D.N.H. Feb. 22, 2006) (deciding that the company's "business practice is not deceptive because all the information consumers need to protect themselves is spelled out in the agreement they sign before [the company] does any work"). The trial court further observed that the State had not produced any authority, and the trial court was not aware of such authority, "for the proposition that the failure of a vendor to disclose its markup to the consumer constitutes a violation of the CPA." The court then determined that the practice of bundling fees and, therefore, of failing to itemize taxes, does not meet the "rascality" test absent evidence that the OTCs acted with fraudulent intent or that their business practices caused any injury to consumers.

On appeal, the State argues, in a conclusory fashion, that the bundling of fees violates a provision of the meals and rooms tax law, RSA 78-A:7, I(a) (Supp. 2018), and, therefore, violates public policy and the CPA. However, we have upheld the trial court's determination that the OTCs are not subject to the meals and rooms tax law.

In addition, the State asserts that bundling is a deceptive practice, within the meaning of the CPA, because consumers may believe that they have paid the meals and rooms tax due on the retail rate of a hotel room, when, in fact, they have not. This assertion, even assuming its accuracy, is insufficient to establish that the practice meets the rascality test. Cf. Fat Bullies Farm, LLC, 170 N.H. at 26 (concluding that "the misrepresentation of a buyer's intentions regarding the future use of real property does not, as a matter of law, rise to the level of rascality necessary for it to constitute an 'unfair or deceptive act or

11

practice'" within the meaning of the CPA). We conclude, therefore, that the State has failed to show that the trial court erred in its ruling as to the CPA.

<u>Affirmed</u>.

LYNN, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.