NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham

Case No. 2022-0348

Citation: Hardy v. Chester Arms, LLC, 2024 N.H. 5

RYAN HARDY & a.

v.

CHESTER ARMS, LLC & a.;

MATTHEW O'CONNOR

v.

CHESTER ARMS, LLC & a.

Argued: February 14, 2023
Opinion Issued: January 30, 2024

McDowell & Morrissette, P.A., of Manchester (Mark D. Morrissette on the brief and orally), for the plaintiffs.

Lehmann Major List, PLLC, of Concord (Sean R. List on the brief and orally), Renzulli Law Firm, LLP, of White Plains, New York (Jeffrey M. Malsch

on the brief), and <u>Sulloway & Hollis, PLLC</u>, of Concord (<u>Kevin M. O'Shea</u> on the brief), for defendant Chester Arms, LLC.

<u>John M. Formella</u>, attorney general, and <u>Anthony J. Galdieri</u>, solicitor general (<u>Jessica A. King</u>, assistant attorney general, on the brief and orally), for defendant Commissioner, New Hampshire Department of Safety.

<u>John M. Formella</u>, attorney general, and <u>Anthony J. Galdieri</u>, solicitor general (<u>Jessica A. King</u>, assistant attorney general, on the memorandum of law), for the State of New Hampshire, as <u>amicus</u> <u>curiae</u>.

BASSETT, J.

[¶1] This case arises from the criminal misuse of a firearm by Ian MacPherson, who unlawfully shot and injured the plaintiffs, two Manchester police officers. The plaintiffs, Ryan Hardy and Matthew O'Connor, brought suit for negligent entrustment against Chester Arms, LLC (Chester Arms) and for negligent entrustment and negligence <u>per</u> <u>se</u> against the Commissioner, New Hampshire Department of Safety. Chester Arms sold MacPherson the firearm, and the Department of Safety (DOS) performed the background check for the sale. The plaintiffs appeal an order of the Superior Court (<u>Ruoff</u>, J.) granting the motions for summary judgment filed by the defendants on immunity grounds. <u>See</u> RSA 508:21 (2010); RSA 541-B:19, I(b) (2021). We affirm.

[¶2] The following facts are derived from the trial court's orders or are otherwise supported by the record. On March 19, 2016, MacPherson sought to purchase a semi-automatic pistol and ammunition from Chester Arms, a Federal Firearms Licensee (FFL). In order to proceed with the sale, a Chester Arms employee asked MacPherson to provide a form of identification and to complete a Bureau of Alcohol, Tobacco, Firearms and Explosives Form 4473, which requires a firearm purchaser to provide identifying information for the purposes of facilitating a background check. The Chester Arms employee then contacted DOS's Permits and Licensing Unit, known as the "Gun Line," to complete the required background check. Gun Line initiated a search of the National Instant Criminal Background Check System (NICS) to determine whether MacPherson was disqualified from the receipt of firearms.

[¶3] Gun Line may approve, deny, or delay a firearm purchase based on the NICS results. Gun Line informed the Chester Arms employee that the sale to MacPherson was given a "delay" status. When a transaction is put on "delay" status, an FFL must wait three business days, at which point, if the

transaction is not denied by Gun Line, the FFL may proceed with the transaction.  The employee informed MacPherson that the transaction was delayed and took his contact information, stating that she would call to inform him when the sale could be completed.  MacPherson left the store.

[¶4] Gun Line delayed the transaction because the NICS database indicated that MacPherson has a record of charges for misdemeanor domestic violence, and Gun Line needed to conduct further research to determine whether this criminal history disqualified MacPherson from purchasing firearms.  On March 23, Gun Line sent faxes to the Merrimack Police Department (MPD) and the circuit court requesting information related to MacPherson's record.  MPD responded by faxing the relevant police reports to Gun Line.  The reports showed that, under federal law, MacPherson's criminal history did not disqualify him from taking possession of the firearm.  An MPD detective also faxed a message to Gun Line communicating that MPD has had "many dealings" with MacPherson, that he was made aware by MacPherson's family members that MacPherson has been diagnosed with schizophrenia, and that "MacPherson has displayed on many occasions delusional behavior which should serve as a significant concern should he obtain a firearm."  Gun Line was, however, unable to obtain supporting documentation of MacPherson's mental health diagnosis.  Several days later, on March 29, the circuit court sent Gun Line case summaries that showed MacPherson had been found, or pled, guilty of the crimes relevant to the NICS background check, and that MacPherson had once been evaluated for competence to stand trial but was allowed to enter a plea after that evaluation.

[¶5] On April 1 — while MacPherson's firearm transaction remained in "delay" status, but after three business days had passed — MacPherson returned to Chester Arms and completed his purchase.  On May 13, MacPherson used the firearm to shoot the plaintiffs.

[¶6] The plaintiffs later filed this action[1] that raises three counts: (1) negligent entrustment against Chester Arms, alleging that Chester Arms "knew, or reasonably should have known, that the person to whom the firearm was supplied was likely to, and did, use the firearm in a manner involving an unreasonable risk of physical injury"; (2) negligent entrustment against DOS, for failing to "ensure[] that Ian MacPherson was not negligently, and without reckless indifference, entrusted with a firearm where [he] was disqualified and unfit to possess a firearm" under federal law; and (3) negligence per se against DOS for its "failure to satisfy its duties under 18 U.S.C. § 922 (d)(3) and (4) and (9)."  Chester Arms and DOS filed motions for summary judgment, and the plaintiffs objected.  The trial court granted motions filed by each of the

---

[1] Because the trial court treated the plaintiffs' suits as a single action brought by both plaintiffs, we do so as well.

3

defendants, concluding that Chester Arms is immune from suit under RSA 508:21 and that DOS is immune from suit under RSA 541-B:19, I(b). The plaintiffs filed a motion for reconsideration, which the trial court denied. This appeal followed.

[¶7] When reviewing the trial court's rulings on motions for summary judgment, we consider the evidence in the light most favorable to the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. See Franciosa v. Hidden Pond Farm, 171 N.H. 350, 354 (2018). If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment. Id. A fact is material if it affects the outcome of the litigation under the applicable substantive law. Id. We review the trial court's application of the law to the facts de novo. Id.

I.      Suit Against Chester Arms

[¶8] We begin by addressing the trial court's grant of summary judgment to Chester Arms. First, we consider the plaintiffs' assertion that the trial court erred in dismissing the suit under RSA 508:21 because Chester Arms waived its immunity argument.

A.      Waiver of Immunity under RSA 508:21

[¶9] We construe the plaintiffs' brief as arguing that immunity under RSA 508:21 is an affirmative defense and that Chester Arms waived its immunity defense because it did not raise immunity in its answer or statement of defenses. Chester Arms does not dispute that it failed to raise immunity in its pleadings. Rather, it argues, and the trial court found, that RSA 508:21 does not provide an affirmative defense, but rather divests the court of subject matter jurisdiction. We agree with Chester Arms.

[¶10] An affirmative defense is a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." Black's Law Dictionary 528 (11th ed. 2019); cf. State v. Soucy, 139 N.H. 349, 352 (1995) (explaining that an affirmative defense serves to "override[]" the elements of an offense). Failure to plead an affirmative defense or to file a timely motion to dismiss based on an affirmative defense constitutes waiver of that defense. See Super. Ct. R. 9(d). By contrast, subject matter jurisdiction concerns a court's authority to decide a case, dependent upon the nature of the case and the type of relief sought. See In re Guardianship of K.B., 172 N.H. 646, 648 (2019); see also In re D.O., 173 N.H. 48, 51 (2020) (describing subject matter jurisdiction as "a tribunal's authority to adjudicate the type of controversy involved in the action" (quotation omitted)). Unlike an affirmative defense, "[a] party may challenge

4

subject matter jurisdiction at any time during the proceeding . . . and may not waive subject matter jurisdiction." D.O., 173 N.H. at 51 (quotation omitted).

[¶11] We look to the language of RSA 508:21 to determine whether it establishes an affirmative defense or pertains to the court's authority to decide this case. When, as here, the parties' arguments require us to engage in statutory interpretation, our review is de novo. Doe v. Attorney General, 175 N.H. 349, 352 (2022). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. The legislature is not presumed to waste words or enact redundant provisions and, whenever possible, every word of a statute should be given effect. Id. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. Id.

[¶12] RSA 508:21 provides, in relevant part: "A qualified civil liability action shall not be brought in any state court." RSA 508:21, II. The statute defines "qualified civil liability action" as "a civil action, in law or in equity, brought by any person against a manufacturer or seller or a trade association of a qualified product" — including certain firearms, see RSA 508:21, I(c) — "for damages resulting from the criminal or unlawful use of a qualified product by the person or a third party," RSA 508:21, I(d). A qualified civil liability action shall not, however, "include an action brought against a manufacturer, seller, or trade organization convicted of a felony under state or federal law, by a party directly harmed by the felonious conduct." Id.

[¶13] RSA 508:21 provides that a particular type of case — a qualified civil liability action — cannot commence in state court. By its plain language, it does not serve to defeat an otherwise viable cause of action, but rather divests the court of authority to hear a particular type of case in the first instance. We accordingly interpret RSA 508:21 not as providing an affirmative defense, but as operating to deprive the court of subject matter jurisdiction. Therefore, Chester Arms cannot have waived immunity under RSA 508:21 by failing to raise the issue in its pleadings. See D.O., 173 N.H. at 51.

B. Scope of Immunity under RSA 508:21

[¶14] We now turn to the merits of the plaintiffs' assertion that the trial court erred when it concluded that RSA 508:21 bars their claims against Chester Arms. The plaintiffs do not dispute that Chester Arms is a "seller . . . of a qualified product" within the meaning of the statute, and that neither Chester Arms nor its agents were convicted of a felony related to the sale of the firearm. Therefore, the dispute on appeal centers on whether the plaintiffs' suit

5

seeks "damages <u>resulting from</u> the criminal or unlawful use of a qualified product by the person or a third party."  RSA 508:21, I(d) (emphasis added).

[¶15] The plaintiffs contend that this language provides immunity only when the harm suffered was "<u>solely</u> caused by wrongful or criminal use of a firearm by a third-party" and, therefore, the statute does not apply here, where Chester Arms allegedly contributed substantially to their injuries.  They further assert that a contrary interpretation would serve to "protect gun dealers whose misconduct was one cause of the resultant harm," contrary to the intent of the legislature.  Alternatively, the plaintiffs argue that, even if the statutory language is ambiguous, the legislative history supports their interpretation.  Chester Arms counters that RSA 508:21 unambiguously "provides complete immunity to firearms dealers" when a third party causes harm using its qualified products, "so long as a dealer is not convicted of a felony related to the transaction."  It asserts that the trial court correctly concluded that the plaintiffs' damages "resulted from" the criminal misuse of a firearm and it is therefore shielded from suit in state court.

[¶16] We first look to the plain language of RSA 508:21.  <u>See</u> <u>Doe</u>, 175 N.H. at 352.  Unless we find statutory language to be ambiguous, we need not examine legislative history.  <u>Bellevue Props. v. Town of Conway</u>, 173 N.H. 510, 515 (2020).   A statute is ambiguous if its "language is subject to more than one reasonable interpretation."  <u>Attorney General, Dir. of Charitable Trusts v. Loreto Publ'ns</u>, 169 N.H. 68, 74 (2016) (quotation omitted).

[¶17] We conclude that the plaintiffs' proposed interpretation is at odds with the plain meaning of the statute.  The plaintiffs ask us to construe the phrase "damages <u>resulting from</u> the criminal or unlawful use of a [firearm]" as referring to damages caused <u>solely</u> by the criminal or unlawful use of a firearm.  RSA 508:21, I(d) (emphasis added).  However, by its plain meaning, the phrase "resulting from" is not so limited.  The plain meaning of the verb "result" is "[t]o arise as a consequence, effect, or outcome of some action, process, or design." <u>The Oxford English Dictionary</u>, https://www.oed.com/dictionary/result_v?tab=meaning_and_use#25723889, (last visited Jan. 23, 2024); <u>accord</u> <u>Webster's Third New International Dictionary</u> 1937 (unabridged ed. 2002) ("to proceed, spring, or arise as a consequence, effect, or conclusion").  Nothing in this definition implies sole causation.  And, although we must interpret statutes in derogation of the common law "strictly," <u>Bisceglia v. Sec'y of State</u>, 175 N.H. 69, 72 (2022), there is no narrower definition of "result" that would support the plaintiffs' interpretation.  <u>See</u> <u>The Oxford English Dictionary</u>, https://www.oed.com/dictionary/result_v?tab=meaning_and_use#25723889, (last visited Jan. 23, 2024).

[¶18] Instead, to adopt the plaintiffs' interpretation, we would have to replace the statutory language "resulting from" with "caused solely by."  This

6

we will not do.  See Bisceglia, 175 N.H. at 71-72, 73.  It is therefore not reasonable to read RSA 508:21, as the plaintiffs urge, as referring to damages caused solely by wrongful or criminal use of a firearm by a third party.  Rather, the plain language of the statute unambiguously refers to damages caused at least in part by such use.  Because the statute is unambiguous, we need not examine its legislative history.  See Bellevue Props., 173 N.H. at 515.  We accordingly conclude that RSA 508:21 provides complete immunity from qualified civil liability actions regardless of whether a third party is partly or solely responsible for a plaintiff's harm.  We find no error in the trial court's ruling on this basis.

###### C.    Whether RSA 508:21 is Preempted by Federal Law

[¶19] The plaintiffs next argue that, because RSA 508:21 is preempted by federal law, the trial court erred when it dismissed their suit.  The doctrine of federal preemption is based upon the Supremacy Clause, contained within Article VI of the United States Constitution.  State v. Exxon Mobil Corp., 168 N.H. 211, 229 (2015).  It provides that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.  "Accordingly, it has long been settled that state laws that conflict with federal law are without effect."  Exxon Mobil, 168 N.H. at 229 (quotation omitted).

[¶20] Two basic principles guide all preemption analyses.  Appeal of Panaggio, 174 N.H. 89, 94 (2021).  First, the purpose of Congress is the ultimate touchstone in every preemption case.  Id.  Second, "[i]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  Id. (quotation omitted).

[¶21] Congressional intent to preempt a state law may manifest in three ways:  Congress may codify language that expressly preempts state law ("express preemption").  Id.  Congress's intent to preempt state law may also be inferred, either when the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation ("field preemption"), or when state law actually conflicts with federal law ("conflict preemption").  Id.; see also Exxon Mobil, 168 N.H. at 229.  The plaintiffs argue that both conflict and field preemption render RSA 508:21 ineffective.

[¶22] We first address the plaintiffs' argument that RSA 508:21 conflicts with the Protection of Lawful Commerce in Arms Act (PLCAA), 15 U.S.C. §§ 7901-7903 (2018).  Like RSA 508:21, the PLCAA shields firearms

7

manufacturers and sellers from "qualified civil liability action[s]," 15 U.S.C. § 7902(a); however, unlike RSA 508:21, the PLCAA contains an exception that allows negligent entrustment suits against sellers. 15 U.S.C. § 7903(5)(A)(ii), (B). The plaintiffs argue that, because RSA 508:21 contains no such exception and therefore prohibits negligent entrustment suits against sellers, it is in conflict with the PLCAA and unenforceable. We disagree.

[¶23] Conflict preemption can arise under two circumstances: "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Exxon Mobil, 168 N.H. at 229 (quotation omitted). RSA 508:21 does not interfere with the enforcement or the accomplishment of the purposes of the PLCAA. One of the PLCAA's purposes is to shield firearms manufacturers and sellers from liability for injuries "solely caused" by the misuse of firearms by third parties. 15 U.S.C. § 7901(b)(1); see also 15 U.S.C. § 7901(a)(6)-(7) (findings supporting the limitation of firearms industry's liability, including that absence of immunity would result in unfounded "expansion of the common law"). The PLCAA exception that permits negligent entrustment suits against sellers is consistent with this purpose because, in such cases, the harm is not caused "solely" by a third party. See 15 U.S.C. § 7901(b)(1); 15 U.S.C. § 7903(5)(A)(ii), (B). However, nothing in the PLCAA requires that states also implement a negligent entrustment exception, nor does it otherwise indicate that this exception is intended to prohibit states from exercising their ability to provide additional protections to sellers by further limiting sellers' liability. See 15 U.S.C. §§ 7901-7903; 15 U.S.C. § 7901(b)(6) (providing that one purpose of PLCAA is to protect the "important principles of federalism, [and] State sovereignty"). In short, the PLCAA aims, in part, to prevent the expansion of common law actions against the firearms industry; RSA 508:21's effect — limiting common law actions in state court against the industry to a greater extent than the PLCAA — does not interfere with the fulfillment of this objective. See Exxon Mobil, 168 N.H. at 229.

[¶24] We now turn to the plaintiffs' field preemption argument. "Field preemption occurs when federal law occupies a 'field' of regulation so comprehensively that it has left no room for supplementary state legislation." Panaggio, 174 N.H. at 94 (quotation omitted). The plaintiffs observe that a "vast scheme of laws . . . regulates the sale of firearms." They therefore argue that the federal government intended to occupy the field of "firearms sales." We disagree.

[¶25] As an initial matter, we observe that the plaintiffs' reference to a "vast scheme of laws" is itself insufficient to show field preemption. Rather, a litigant arguing preemption "must point specifically to a constitutional text or a federal statute that does the displacing." Id. at 95 (quotation omitted). Therefore, we limit our review to the specific statutes to which the plaintiffs refer: the PLCAA, 15 U.S.C. §§ 7901-7903, and 18 U.S.C. chapter 44 (2018).

8

[¶26] Both the PLCAA and 18 U.S.C. chapter 44 display a clear intent to preserve states' ability to regulate the sale of firearms. 18 U.S.C. chapter 44 — which contains the Brady Act, see Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536, 1536-44 (1993) (codified at 18 U.S.C. §§ 921-922, 924, 925A) — is the section of the federal criminal code regarding firearms. It explicitly provides that "[n]o provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter." 18 U.S.C. § 927 (2018). Likewise, the PLCAA is not intended to be a comprehensive regulatory scheme and specifically acknowledges the possibility that states will pass their own firearms sales regulations. See 15 U.S.C. § 7903(5)(A)(iii). Moreover, one of the stated purposes of the PLCAA is to "preserve and protect the Separation of Powers doctrine and important principles of federalism, State sovereignty and comity between sister States." 15 U.S.C. § 7901(b)(6). For these reasons, we cannot conclude that Congress intended these laws to operate, either together or separately, to fully occupy the field of regulating gun sales. See Exxon Mobil, 168 N.H. at 229; see also Panaggio, 174 N.H. at 94.

[¶27] In sum, we determine that neither conflict nor field preemption prevents enforcement of RSA 508:21. This conclusion is in accord with the two cases from other jurisdictions in which courts have been called upon to address whether the PLCAA preempts their state immunity statutes, which, like New Hampshire's, provide greater protection to firearms industry actors than that provided by the PLCAA. See Phillips v. Lucky Gunner, LLC, 84 F. Supp. 3d 1216, 1221-22, 1227 (D. Colo. 2015) (rejecting arguments that PLCAA preempts more protective state statute) (statute at issue repealed effective Oct. 1, 2023); KS&E Sports v. Runnels, 72 N.E.3d 892, 904-05 (Ind. 2017) (concluding that Indiana's more protective state law operated "in tandem" with the PLCAA). As the Indiana Supreme Court concluded, "neither the [PLCAA]'s terms nor its scope implies Congress intended to foreclose states from providing greater protection to firearms sellers." KS&E Sports, 72 N.E.3d at 905.

D.    Whether RSA 508:21 is Unconstitutional

[¶28] Finally, we consider the plaintiffs' argument that RSA 508:21 violates their right to a remedy under Part I, Article 14 and their right to equal protection under Part I, Article 2 of the State Constitution. Claims that a statute violates the right to a remedy and the right to equal protection may be addressed in a single analysis. Lennartz v. Oak Point Assocs., 167 N.H. 459, 462 (2015); see also Huckins v. McSweeney, 166 N.H. 176, 181 (2014) (asserting that Part I, Article 14 "is basically an equal protection clause in that it implies that all litigants similarly situated may appeal to the courts both for relief and for defense under like conditions and with like protection and without discrimination" (quotation omitted)). The constitutionality of a statute

9

involves a question of law, which we review de novo. Lennartz, 167 N.H. at 462.

[¶29] The plaintiffs do not specify whether their constitutional challenges are facial or as-applied attacks on RSA 508:21. See Huckins, 166 N.H. at 179 (explaining the difference between facial and as-applied constitutional challenges). We assume, in the plaintiffs' favor, that they raise both. We begin by addressing the plaintiffs' as-applied challenge because, if the statute is constitutional as applied to them, then, by necessity, both of their challenges must fail. See id. at 179-80.

[¶30] The "equal protection guarantee is essentially a direction that all persons similarly situated should be treated alike." Lennartz, 167 N.H. at 462 (quotation omitted). When a statute creates classifications of persons, the classification cannot be arbitrary, but rather must reasonably promote some proper object of public welfare or interest. Id. In considering an equal protection challenge under our State Constitution, we must first determine the standard of review by examining the purpose and scope of the state-created classification and the individual rights affected. Id. The possible review standards are commonly known as strict scrutiny, intermediate scrutiny, and the rational basis test. Id.

[¶31] Because the constitutional right to a remedy is an "important substantive right," we apply intermediate scrutiny. Id. at 462-63. To be upheld under intermediate scrutiny, state-created classifications of individuals must be substantially related to an important governmental objective. Id. at 463. The burden to demonstrate that the challenged legislation meets this test rests with the party seeking to uphold the statute — in this case, Chester Arms. Id. The party may not rely upon justifications that are hypothesized or invented post hoc in response to litigation, nor upon overbroad generalizations. Id.

[¶32] Chester Arms does not challenge the plaintiffs' assertion that the statute creates classifications of individuals in that it distinguishes plaintiffs who are victims of gun violence from plaintiffs who are injured by other means. Instead, the parties disagree about whether this classification is substantially related to an important governmental objective. We agree with Chester Arms that it is.

[¶33] To discern the legislative purpose for creating a classification, we may look to legislative history. See Winnisquam Reg. Sch. Dist. v. Levine, 152 N.H. 537, 539-40 (2005). The bill that became RSA 508:21 was introduced as furthering two related aims:

I. Prohibit[ing] civil liability causes of action against manufacturers, distributors, dealers, and importers of firearms or

10

ammunition for the harm caused by the criminal or unlawful misuse of their products by others.

II.  Preserv[ing] a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

House Bill 811 (2003).  The legislative history also reflects an intent to protect the firearms industry from costly litigation thereby ensuring its solvency.  See An Act relative to limiting the liability of manufacturers, distributors, dealers, or importers of firearms, HB 811, 2003 Session (Apr. 29, 2003 Senate Wildlife & Recreation Committee hearing report summarizing testimony received regarding, among other things, high cost of defending litigation); An Act relative to the exclusive authority of the state over the regulation of firearms, HB 811, 2003 Session (March 19, 2003 House Judiciary Committee report including statement of intent).[2]

[¶34] This legislative history demonstrates that the statute is designed, in part, to achieve the important governmental objective of safeguarding citizens' fundamental right to bear arms.  See N.H. CONST. pt. I, art. 2-a; McDonald v. Chicago, 561 U.S. 742, 778 (2010).  The classification created by RSA 508:21 is substantially related to that purpose: it limits suits against the firearms industry thereby protecting its solvency and ensuring law-abiding citizens have access to the firearms necessary for exercising their fundamental right to bear arms.

[¶35] In response, the plaintiffs observe that RSA 508:21 immunity extends to firearms sellers who "negligently entrust firearms to obviously mentally ill individuals" who display a propensity for violence, and argue that immunity in such cases does not promote citizens' ability to access firearms for lawful purposes.  We are unpersuaded.  The plaintiffs' argument fails to recognize that RSA 508:21 achieves its legislative aim by protecting the firearms industry from litigation costs.  Any civil suit could cause a firearm seller to incur these costs.  To that end, providing immunity to firearms sellers who negligently entrust firearms to mentally ill individuals — whether doing so is desirable from other policy perspectives — furthers RSA 508:21's purpose of protecting the solvency of the firearms industry and, by extension, protecting all citizens' access to firearms for lawful purposes.

[¶36] The plaintiffs also argue that RSA 508:21 has the impermissible effect of abolishing "all recovery" for their injuries.  To the contrary, the statute

---

[2] This legislative history can be accessed on the General Court of New Hampshire's website at: https://gencourt.state.nh.us/BillHistory/SofS_Archives/2003/house/HB811H.pdf; https://gencourt.state.nh.us/BillHistory/SofS_Archives/2003/senate/HB811S.pdf (last visited Jan. 23, 2024).

does not bar the plaintiffs from seeking damages from MacPherson. See RSA 508:21 (barring certain actions against manufacturers, sellers, and trade associations of qualified products). Although the plaintiffs may be dissatisfied with this prospect, Part I, Article 14 "does not guarantee that all injured persons will receive full compensation for their injuries." Huckins, 166 N.H. at 180 (quotation omitted).

[¶37] For the foregoing reasons, we conclude that the application of RSA 508:21 to bar the plaintiffs' suit violated neither their constitutional right to equal protection nor their right to a remedy. See id. at 180-81 (plaintiff's right to a remedy not violated because, although he could not sue municipality, he retained ability to bring claim directly against tortfeasor). We therefore conclude that their as-applied and facial constitutional challenges to the statute fail. See id. at 179-80. Accordingly, we affirm the trial court's grant of summary judgment to Chester Arms.

II.      Suit Against New Hampshire Department of Safety

[¶38] We now turn to the plaintiffs' arguments that the trial court erred when it granted DOS summary judgment on immunity grounds. The plaintiffs argue that the trial court failed to review the factual record in the light most favorable to them and that DOS is not immune under RSA 541-B:19, I(b) because it did not exercise "due care" when it conducted its background check of MacPherson. See RSA 541-B:19, I(b). DOS counters that the trial court did not err when it concluded that DOS is immune. Alternatively, DOS argues that, even if the court's immunity determination was erroneous, any error was harmless because there is "another basis that independently compels summary judgment" — namely, that MacPherson was not, at the relevant time, actually barred by federal law from purchasing a firearm. (Quotation and brackets omitted.) Because we agree with DOS that any error in the court's immunity analysis was harmless, we need not reach the merits of the plaintiffs' immunity arguments.

[¶39] "A harmless error is an error that does not affect the outcome." Attorney General v. Morgan, 132 N.H. 406, 408 (1989) (quotation omitted). At summary judgment, an error is harmless where "the trial court and this court identif[y] other grounds that independently compel" summary judgment. McNair v. McNair, 151 N.H. 343, 355 (2004); Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 29 (2017) (applying the McNair rule to conclude that trial court's grant of summary judgment on erroneous basis was harmless). Here, as part of its immunity analysis, the trial court observed that, even if DOS were held to a "simple negligence" standard, it would not be liable because the record contains "no disqualifying information" about MacPherson. Based on our review of the record, we agree that the lack of evidence demonstrating that MacPherson was disqualified from purchasing a firearm at

the relevant time independently compels entry of summary judgment. See Fat Bullies Farm, 170 N.H. at 29.

[¶40] The plaintiffs' claims against DOS are factually and legally dependent upon the premise that MacPherson was disqualified from owning a firearm under federal law at the relevant time. Indeed, the allegation that MacPherson was disqualified is integral to the plaintiffs' claims as alleged against DOS. Additionally, if MacPherson was not disqualified from owning a firearm under federal law at the relevant time, then the plaintiffs' claims fail as a matter of law. Both claims brought by the plaintiffs — negligence per se and negligent entrustment — require that they establish that any breach of duty by DOS proximately caused their harm. See Estate of Joshua T. v. State, 150 N.H. 405, 407-08 (2003) (describing proof of causation required for negligence claim); Dunbeck v. Exeter & Hampton Elec. Co., 119 N.H. 4, 6 (1979) (elements of negligence per se); Fletcher v. Kunze, 125 N.H. 277, 279-80 (1984) (jury instructions adequately explained that liability for negligent entrustment requires proof of proximate causation). If MacPherson was, at the relevant time, qualified to purchase a firearm, then he would have taken possession of the firearm regardless of whether DOS was negligent in performing the background check. See 28 C.F.R. § 25.6(c)(1)(iv) (2022) (describing the circumstances under which DOS may allow, deny, or delay a purchase). In other words, if DOS can show that, even viewing the record in the light most favorable to the plaintiffs, MacPherson was qualified under federal law, the plaintiffs would be unable to establish that the shooting occurred as a result of DOS's negligence, and DOS would be entitled to judgment as a matter of law. See Franciosa, 171 N.H. at 354.

[¶41] The plaintiffs assert that MacPherson was, at the time of the purchase, disqualified from owning a firearm under 18 U.S.C. § 922(g)(4), which provides:

(g) It shall be unlawful for any person—

. . .

   (4) who has been adjudicated as a mental defective or who has been committed to a mental institution;

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

13

18 U.S.C. § 922(g)(4) (2018).[3]  Under the applicable federal regulation, an individual is "adjudicated as a mental defective" when he is subject to "[a] determination by a court, board, commission, or other lawful authority that," as a result of mental illness, he "[i]s a danger to himself or to others" or "[l]acks the mental capacity to contract or manage his own affairs."  27 C.F.R. § 478.11 (2022).  "Committed to a mental institution" means "[a] formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority," but excludes voluntary admission to a mental institution.  Id.

[¶42] The plaintiffs contend that the record demonstrates that MacPherson was either committed to a mental institution or adjudicated a mental defective: (1) when his competency was evaluated during a 2012 criminal proceeding; (2) when he was taken into custody by the police and then admitted to the New Hampshire Hospital in 2007; or (3) when he was admitted to a hospital in Chicago in 2014.  DOS counters that none of these circumstances meets the applicable definitions.  We address each occasion in turn.

[¶43] In 2012, after MacPherson was charged with the assault of his father, MacPherson's attorney requested that he be evaluated for competency to stand trial.  After an evaluation, the psychologist recommended that MacPherson be found competent, and MacPherson was later permitted to enter a guilty plea.  The record thus contains no evidence that MacPherson's 2012 evaluation resulted in a commitment to a mental institution or a determination by a court, board, commission, or other lawful authority that he was a danger to himself or others or unable to manage his own affairs.

[¶44] As for the other two incidents, MacPherson was evaluated by medical professionals and admitted to what we assume, for the purposes of this appeal, were "[m]ental institution[s]."  See 27 C.F.R. § 478.11.  However, neither incident meets the federal definitions of a commitment to a mental institution or an adjudication as a mental defective.

[¶45] In 2007, MacPherson was the subject of a petition for involuntary emergency admission (IEA).  See RSA 135-C:27, :28, II (2021).  As part of that proceeding, a police officer and a justice of the peace certified that they believed that MacPherson should be subject to a compulsory mental examination.  See RSA 135-C:28, II.  Following that examination, an approved physician certified that MacPherson posed a likelihood of danger to himself or others.  See RSA 135-C:27; RSA 135-C:28, I (2021).  MacPherson was then transferred to the New Hampshire Hospital and was held over a weekend.  See RSA 135-C:29, I (2021).  He was entitled to a probable cause hearing within three days of his

---

[3] Although MacPherson's application was initially delayed because of his criminal history pursuant to 18 U.S.C. § 922(g)(9), the plaintiffs concede that MacPherson's criminal history did not disqualify him from owning a firearm.

admission. See RSA 135-C:31, I (2021). Although the record indicates that a hearing was scheduled, there is no evidence that it was held. Rather, MacPherson was discharged on the day of the scheduled hearing.

[¶46] Absent a finding that MacPherson posed a danger to himself or others following a contested, adjudicatory hearing — such as a probable cause hearing under RSA 135-C:31 — we cannot conclude that the 2007 events qualify as a commitment to a mental institution under 27 C.F.R. § 478.11. See United States v. Rehlander, 666 F.3d 45, 50 (1st Cir. 2012) (temporary hospitalization under Maine's involuntary admission statute not a "commitment" under 18 U.S.C. § 922(g)(4)). Moreover, none of the decision-makers involved in the IEA proceeding qualifies as "a court, board, commission, or other lawful authority" that could have adjudicated MacPherson a mental defective. 27 C.F.R. § 478.11; see Franklin v. Sessions, 291 F. Supp. 3d 705, 715-17 (W.D. Pa. 2017) (concluding that decisions by a police officer, a county employee, and a physician did not qualify as adequate authority to consider individual adjudicated as a mental defective or committed to a mental institution); United States v. Tucker, 47 F.4th 258, 260-61 (5th Cir. 2022) (plain meaning of "adjudicated" in 18 U.S.C. § 922(g)(4) contemplates judicial process).

[¶47] Finally, we turn to MacPherson's 2014 admission to a hospital in Chicago, which was voluntary. Voluntary admissions are explicitly excluded under the definition of "[c]ommitted to a mental institution." 27 C.F.R. § 478.11. Further, the medical records from this admission do not establish that he was adjudicated a mental defective. Although the records, viewed in the light most favorable to the plaintiffs, reflect concerns of medical providers that MacPherson posed a danger to himself, the records do not demonstrate that "a court, board, commission, or other lawful authority" determined that he was a danger to himself or others. Id.; see Franklin, 291 F. Supp. 3d at 715-16 (concluding that "other lawful authority" does not include the determination of a physician outside of a judicial or quasi-judicial proceeding).

[¶48] Our review of the record, even viewed in the light most favorable to the plaintiffs, establishes that MacPherson was not disqualified at the relevant time from possessing a firearm under 18 U.S.C. § 922(g)(4). See Franciosa, 171 N.H. at 354. We therefore conclude that DOS has met its burden of demonstrating that it is entitled to judgment as a matter of law.

III.    Conclusion

[¶49] In sum, we affirm the trial court's grant of summary judgment to Chester Arms and DOS. To the extent the plaintiffs raise additional arguments not discussed above, they are not adequately developed for our review,

15

see <u>State v. Blackmer</u>, 149 N.H. 47, 49 (2003), or otherwise do not warrant further discussion, <u>see</u> <u>Vogel v. Vogel</u>, 137 N.H. 321, 322 (1993).

<u>Affirmed</u>.

       HANTZ MARCONI and DONOVAN, JJ., concurred; HICKS, J., sat for oral argument but did not participate in the final vote, <u>see</u> N.H. CONST. pt. II, art. 78.